

Opinions of the United
States Court of Appeals
for the Third Circuit

12-29-2004

# Slutzker v. Johnson

Precedential or Non-Precedential: Precedential

Docket No. 03-4046

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Slutzker v. Johnson" (2004). *2004 Decisions.* Paper 3.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/3

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

Nos. 03-4046 & 03-4219

———

STEVEN G. SLUTZKER

*Appellant in No. 03-4219*

v.

PHILIP JOHNSON; *GERALD J. PAPPERT; STEPHEN A.
ZAPPALA, JR., District Attorney, Allegheny County, PA,

*Appellants in No. 03-4046*

*Amended per Clerk's Order of 08/17/04

———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 99-cv-1952)
District Judge: Honorable Gary L. Lancaster

———

Argued October 4, 2004
Before: SLOVITER, BECKER, and STAPLETON, *Circuit
Judges*.

(Filed December 29, 2004)

DOUGLAS SUGHRUE (ARGUED)
Allen & Sughrue
428 Forbes Avenue
Suite 1600

1

Pittsburgh, PA 15219
*Attorney for Steven G. Slutzker*

RONALD M. WABBY, JR. (ARGUED)
Office of District Attorney
401 Allegheny County Courthouse
Pittsburgh, PA 15219
*Attorney for Philip Johnson et al.*

———

OPINION OF THE COURT

———

BECKER, *Circuit Judge*.

This is an appeal by the Commonwealth of Pennsylvania from an order of the District Court granting habeas corpus relief to Steven G. Slutzker from a twelve-year-old conviction in a nearly thirty-year-old murder case. When John Mudd Sr. was murdered in his home in late 1975, suspicion soon focused on Slutzker, who had been having an affair with Mudd's wife, and who had attempted to hire a hit man to kill him. At the time, prosecutors could not assemble enough evidence to incriminate Slutzker, and no one was indicted for the crime. Fifteen years later, however, Mudd's son, John Mudd Jr., approached police and claimed to have recovered previously repressed memories of his father's murder—including an image of Slutzker fleeing the scene of the crime. Slutzker was arrested, prosecuted, and convicted of the murder, and was sentenced to life in prison.

Slutzker filed a habeas corpus petition alleging numerous constitutional errors at his trial. The District Court granted habeas relief on two of these grounds, a *Brady* violation and ineffective assistance of counsel. The court granted a certificate of appealability on these two grounds, and also on a third—the trial court's refusal to compel Mudd's wife, Arlene Mudd Stewart, to

2

testify.[1] Slutzker cross-appeals from the denial of relief on this issue.

For the reasons set forth below, we will hold that the District Court was correct in finding a *Brady* violation, and that, although this claim was procedurally defaulted, Slutzker has demonstrated cause and prejudice sufficient to excuse the default. We will therefore affirm on that claim. We will also affirm the District Court's denial of relief for the refusal to compel Arlene Mudd to testify. However, because we determine that the writ of habeas corpus should be granted due to the *Brady* violation, we will not reach the question whether Slutzker's trial attorney rendered ineffective assistance. Although the District Court did not specify the exact nature of the relief granted, we think it clear that the court meant to order Slutzker released unless the Commonwealth elects to retry him, and we will therefore modify the District Court's order to so provide.

## I. Facts and Procedural History

### A. Background Facts

The power went out at John Mudd Sr.'s house in Wilkinsburg, Pennsylvania, on December 28, 1975, at around 11 p.m. Mudd went to check the fuse, and was shot six times with a .32 caliber handgun by an intruder who was secreted in the basement. Mudd's wife Arlene, and their five-year-old son John Jr., were upstairs at the time of the murder.

Mudd's neighbor Steven Slutzker soon became the prime suspect in the murder. He had been having an affair with Arlene Mudd; she had briefly moved out of her house and lived with him in the summer of 1975. Significant evidence showed that Slutzker had been planning to kill Mudd. In early December, Slutzker had purchased a .32 caliber handgun and asked a co-worker to show

---

[1]We note that, although the District Court issued a certificate of appealability as to the two grounds on which it granted the habeas petition, such a certificate was not required: the Commonwealth may appeal a grant of habeas corpus as of right. Fed. R. App. P. 22(b)(3); *see also United States ex rel. Tillery v. Cavell*, 294 F.2d 12, 15 (3d Cir. 1961).

him how to load it. On December 19, he had telephoned a friend, Michael Pezzano, and asked if Pezzano knew any hit men, because he wanted to kill Mudd to be with Arlene. A few days later, Slutzker offered to pay Pezzano $500 and provide him with the handgun he had purchased if Pezzano would kill Mudd. Pezzano said he would consider it, then reported this conversation to the state police. The police took no immediate action. Slutzker claims that Arlene had insisted that he kill Mudd because he had abused her; he also claims that he ended the conspiracy, and his relationship with Arlene, on December 26, 1975.

The police investigated the murder and quickly tracked down Slutzker, who was staying (along with his six-year-old daughter Amy) at the house of friends, Patrick and Janet O'Dea, in McKeesport. The O'Deas told the police that Slutzker had stayed at their house on the night of the murder, that he had been drinking heavily, and that he had passed out on their bed at around 8 p.m. The O'Deas claim next to have seen Slutzker at around 1 a.m., when they woke him to move him to the living-room couch so that they could go to sleep. *Id.* at 63. While they were not completely consistent in all their statements, they generally represented that Slutzker could not possibly have awakened, sobered up, taken their car, and driven to Wilkinsburg and back to commit the murder within the time in which they left him alone. Slutzker's car had not been moved from the O'Deas' house on the night of the murder.

Despite this alibi, the police arrested Slutzker for criminal homicide and solicitation to commit murder. Arlene Mudd was charged with solicitation. Janet O'Dea was charged with conspiracy for allegedly disposing of the murder weapon, which was never found. However, all homicide charges were dismissed at the coroner's inquest, at which Arlene Mudd testified that Slutzker was not present when her husband was killed. Charges against Arlene Mudd were also dismissed. Janet O'Dea was offered a deal if she would testify against Slutzker; she refused, and was tried for conspiracy and acquitted.

Slutzker was convicted of solicitation on Pezzano's testimony. *See Commonwealth v. Slutzker*, 393 A.2d 1281 (Pa. Super. Ct. 1978). He served about a year in prison. He was released, moved away, remarried, and lived quietly for nearly fifteen years. Then, in November 1990, John Mudd Jr., who was five years old at the time of the murder, told police that he

4

remembered who killed his father. He said that he had repressed memories of seeing his father's body at the foot of the basement stairs, and of seeing Slutzker fleeing from his house. Fifteen years later, he claims, he recovered those vivid memories while fighting with an acquaintance. He talked to the police in November 1990, and gave a comprehensive statement to a psychologist some four months later. On the basis of these statements, the Commonwealth brought murder charges against Slutzker and Arlene Mudd. The charges against Arlene Mudd were later dropped.

The eyewitnesses who testified against Slutzker at trial included John Mudd Jr.; Cynthia DeMann, a neighbor who testified that she saw Slutzker talking with Arlene Mudd shortly after the killing; Timothy Brendlinger, a policeman who also testified that he saw Slutzker talking with Arlene after the killing; and Amy Slutzker, Slutzker's estranged daughter, who testified that she and her father were at home on the night of the murder, and that she saw him take a gun and leave the house minutes before the police arrived. Amy Slutzker was only six years old at the time of the murder. She did not claim recovery of repressed memory, only that she was afraid of her father and had previously declined to come forward with her story.

Slutzker's trial attorney, Charles Scarlata, never called the O'Deas to testify in support of Slutzker's alibi.[2] He did attempt to call Arlene Mudd, but she claimed the Fifth Amendment privilege against self-incrimination, and the trial court refused to compel her to testify. In January 1992, the jury convicted Slutzker of murder. He was sentenced to life in prison.

## B. Post-Conviction Proceedings

Slutzker appealed his conviction, raising a number of issues, including the competency of the recovered-memory testimony and the fact that the trial court did not compel Arlene Mudd to testify. The Pennsylvania Superior Court affirmed the conviction in October 1993; the Pennsylvania Supreme Court denied a petition

---

[2]Scarlata died in March 2000. Slutzker was represented by Chris Rand Eyster during his PCRA petition. He initially filed his federal habeas petition pro se; his current attorney, Douglas Sughrue, entered an appearance on May 8, 2002.

for allocatur in April 1994.

In January 1996, Slutzker filed a petition under the Pennsylvania Post Conviction Relief Act, 42 Pa. Cons. Stat. §§ 9541-9545 (PCRA). His PCRA petition raised sixteen issues relating to ineffective assistance of trial counsel. The PCRA court conducted evidentiary hearings, during which it took testimony from Scarlata. The court dismissed the petition, and the Superior Court affirmed; the Pennsylvania Supreme Court denied review in November 1999.

On December 1, 1999, Slutzker filed a pro se Petition for Writ of Habeas Corpus in the District Court for the Western District of Pennsylvania. The Petition was assigned to Magistrate Judge Kenneth J. Benson. In 2001, Slutzker, still representing himself, sent a subpoena to the Wilkinsburg police department (which had jurisdiction over the murder investigation) requesting any information relevant to his case. On September 11, 2001, the police sent him twenty-one police reports which apparently had not previously been disclosed to him or his lawyers. Upon receiving these materials, Slutzker wrote to Magistrate Judge Benson explaining the new evidence and the impact it might have had at trial. Slutzker never received a response to this letter.

On September 12, 2002, the case was reassigned to Magistrate Judge Susan Paradise Baxter. On January 10, 2003, Slutzker, now represented by counsel, filed an Amended Petition for Habeas Corpus asserting a number of claims. Magistrate Judge Baxter rejected most of these claims in her final Report and Recommendation. However, she recommended granting the petition, and a certificate of appealability, on two grounds: a claim founded on *Brady v. Maryland*, 373 U.S. 83 (1963), on account of the previously undisclosed police reports, and a claim of ineffective assistance of counsel, based on Scarlata's failure to interview the O'Deas or call them as alibi witnesses. On a third issue, the failure to compel Arlene Mudd to testify at trial, Magistrate Judge Baxter recommended denying relief, but granting a certificate of appealability. She recommended denying a certificate of appealability on all other grounds. On September 25, 2003, the District Court adopted the Magistrate Judge's report and order. The Commonwealth then appealed, and Slutzker cross-appealed on the issue of Arlene Mudd's refusal to testify.

Our review of the District Court's legal conclusions is

plenary. *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 368 (3d Cir. 2002). In this case, our review of the District Court's factual findings is also plenary, because that Court relied solely on the state court record, and did not conduct an evidentiary hearing. *Duncan v. Morgan*, 256 F.3d 189, 196 (3d Cir. 2001).

## II. The *Brady* Claim

The Commonwealth argues that the District Court erred in granting habeas relief on Slutzker's *Brady* claim. It submits that the claim was procedurally defaulted; that the police reports had in fact been disclosed to the defense before trial; and that, even if they had not been disclosed, the *Brady* violation did not prejudice the outcome of Slutzker's trial. We shall address each of these contentions below. First, however, to clarify the later discussion, we describe the disputed police reports in somewhat greater detail.

## A. The Police Reports

The *Brady* evidence consists of twenty-one police reports detailing interviews with Mudd's and Slutzker's friends and neighbors conducted by the Wilkinsburg Police from December 1975 through February 1976. The most important of the reports describes a January 15, 1976, interview with Cynthia DeMann, Mudd's next-door neighbor. In two previous interviews with the police, on December 29 and 30, 1975, Mrs. DeMann had told police that she saw Arlene Mudd talking to a man in front of her house shortly after the murder, but that she was unable to identify him. The reports of these interviews were concededly turned over to the defense. In the January 15 interview, however, Mrs. DeMann definitively stated that the man she saw with Mrs. Mudd was *not* Slutzker. The police report says:

> Mrs. DeMann stated she thinks if it was Steve [Slutzker] standing in front of the house, she would have recognized him. She stated Steve is a very tall man, but the man that was standing out front was not very tall. Mrs. DeMann stated she thinks Steve is about 6 foot. Whoever it was beside her [Arlene

Mudd] was only about a forehead taller.[3]
These statements do not appear in the other interviews with Mrs. DeMann. The remaining police reports are of considerably lesser importance.[4]

## B. Procedural Barriers to Slutzker's Claim

Before reaching the merits of the alleged *Brady* violation, we consider the Commonwealth's contention that it is procedurally defaulted. This contention depends on Pennsylvania's PCRA time bar. Slutzker claims to have received the twenty-one previously undisclosed police reports on September 11, 2001. Under the Pennsylvania PCRA, a prisoner may file a challenge to his conviction for up to one year after the judgment becomes final, unless the facts upon which the challenge is predicated were unknown at that time. 42 Pa. Cons. Stat. § 9545(b)(1). If the predicate facts are discovered after this one-year period, the prisoner must file his petition within sixty days of discovery. *Id.* § 9545(b)(2).

Slutzker's conviction became final on May 17, 1994, when the Supreme Court of Pennsylvania denied his motion for reconsideration of its denial of direct review. *See* 42 Pa. Cons. Stat. § 9545(b)(3) (judgment becomes final on conclusion of direct review). He filed a PCRA petition in January 1996, which perforce did not mention the then-undiscovered *Brady* documents. He was denied PCRA relief in September 1997, and fully exhausted his PCRA appeals, which concluded in November 1999. He filed a pro se petition for habeas corpus in federal court in December 1999.

When Slutzker discovered the police reports, his pro se habeas petition was pending in the federal courts. He did not move to stay or dismiss this petition so as to file a second PCRA petition based on the newly discovered facts. The Commonwealth asserts that Slutzker's failure to file a second PCRA petition led to a procedural default on the *Brady* issue. Because the Pennsylvania

---

[3]The record does not disclose how tall Mrs. Mudd is, nor did the parties have any comment on the issue at oral argument.

[4]The Magistrate Judge summarized the most important of these reports in her Report and Recommendation.

courts never had the opportunity to address this claim, the Commonwealth argues that it is now foreclosed.

## 1. Exhaustion

The starting point for our analysis is the habeas statute, which requires that prisoners exhaust their claims in state court before seeking relief from the federal courts. 28 U.S.C. § 2254(b)(1)(A); *see also Landano v. Rafferty*, 897 F.2d 661, 668 (3d Cir. 1990). There is no dispute that Slutzker has not exhausted his *Brady* claim. He discovered it in September of 2001, well after his PCRA appeals had terminated, and while his original pro se habeas petition was pending. He never returned to state court with a second PCRA petition, and thus denied the Pennsylvania courts the opportunity to rule on this claim. Under the doctrine of *Fay v. Noia*, 372 U.S. 391 (1963), and *Rose v. Lundy*, 455 U.S. 509, 522 (1982), federal courts must dismiss without prejudice habeas petitions that contain any unexhausted claims.[5]

The exhaustion requirement does not apply, however, in cases where the state courts would not consider the unexhausted claims because they are procedurally barred. *Doctor v. Walters*, 96 F.3d 675, 681 (3d Cir. 1996); *cf. Toulson v. Beyer*, 987 F.2d 984, 987 (3d Cir. 1993) ("A petition containing unexhausted but procedurally barred claims in addition to exhausted claims, is not a mixed petition requiring dismissal under *Rose*."). This conclusion stems from the doctrine that exhaustion is not required where pursuit of state remedies would be futile. *Doctor*, 96 F.3d at 681; *Szuchon v. Lehman*, 273 F.3d 299, 323-24 n.14 (3d Cir. 2001); *cf.* 28 U.S.C. § 2254(b)(1)(B) (excusing exhaustion where "there is an absence of available State corrective process"). Where exhaustion is excused because of this form of futility, the habeas doctrine of procedural default may apply to bar relief. *See infra* Part II.B.2.

---

[5]In *Crews v. Horn*, 360 F.3d 146, 151 (3d Cir. 2004), this Court, citing *Zarvela v. Artuz*, 254 F.3d 374, 379-80 (2d Cir. 2001), found that the one-year time limit on habeas petitions introduced by the Antiterrorism and Effective Death Penalty Act had altered the rule of *Rose v. Lundy* to allow a district court to stay, rather than dismiss, a mixed habeas petition. We shall have more to say about this "stay and abey" rule in Part II.B.3.b, *infra*.

The mere existence of a state procedural rule that would appear to bar relief is not, however, sufficient to avoid the exhaustion requirement. The policy behind the exhaustion requirement is to give state courts a full opportunity to address the petitioner's claims. *Doctor*, 96 F.3d at 681. Given this, if there is any likelihood that the state courts would consider the merits of a petitioner's unexhausted claim, the federal courts should dismiss his petition and allow him to seek relief in state courts. *Id.* at 686 (Scirica, J., concurring). We reach the merits only if state law "*clearly* foreclose[s] state court review of the unexhausted claims." *Toulson*, 987 F.2d at 987 (emphasis added).

Here, however, it seems certain that the Pennsylvania courts would not entertain Slutzker's *Brady* claim after the 60-day PCRA limit. The time limits under 42 Pa. Cons. Stat. § 9545(b) are mandatory and jurisdictional in nature, *Commonwealth v. Murray*, 753 A.2d 201, 203 (Pa. 2000), and "the PCRA confers no authority upon [any Pennsylvania] Court to fashion *ad hoc* equitable exceptions to the PCRA time-bar in addition to those exceptions expressly delineated in the Act," *Commonwealth v. Robinson*, 837 A.2d 1157, 1161 (Pa. 2003); *see also Commonwealth v. Eller*, 807 A.2d 838, 845 (Pa. 2002). No argument that Slutzker had good reason for failing to file within the 60-day period is relevant, because

> the period for filing a PCRA petition is not subject to the doctrine of equitable tolling; instead, the time for filing a a PCRA petition can be extended only to the extent that the PCRA permits it to be extended, i.e., by operation of one of the statutorily enumerated exceptions to the PCRA time-bar.

*Commonwealth v. Cruz*, 852 A.2d 287, 292 (Pa. 2004) (internal quotation marks omitted); *see also Commonwealth v. Fahy*, 737 A.2d 214, 222 (Pa. 1999). The statutory exceptions are contained in § 9545(b)(1), and a petition invoking such an exception must be filed within 60 days of the time that the claim could have been presented, § 9545(b)(2). Here, it was not.

Since Slutzker gets no help from the statutory exceptions, and since the Pennsylvania courts will not consider late-filed petitions, there is no doubt that Slutzker cannot now bring his *Brady* claim in the Pennsylvania courts. Thus his failure to exhaust that claim is excused under 28 U.S.C. § 2254(b)(1)(B).

2. The Procedural Default Framework

This excuse from the exhaustion requirement does Slutzker no good, however, unless he can avoid the concomitant doctrine of procedural default. *See Doctor*, 96 F.3d at 683. This doctrine "applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).[6] The *raison d'être* for the doctrine lies in the fact that a state judgment based on procedural default rests on independent and adequate state grounds. *Id.* at 730; *see also Wainwright v. Sykes*, 433 U.S. 72, 81-82 (1977).

In this case, there is no doubt that Slutzker has defaulted on his *Brady* claims under Pennsylvania law. *See supra* Part II.B.1. Therefore, this Court may reach the merits of Slutzker's *Brady* claims only "if the petitioner makes the standard showing of 'cause and prejudice' or establishes a fundamental miscarriage of justice." *Lines v. Larkins*, 208 F.3d 153, 166 (3d Cir. 2000); *see also Coleman*, 501 U.S. at 749-50.[7] Slutzker argues that he has established cause and prejudice for his default.

3. Cause and Prejudice

[6]While *Coleman* concerned a case where the state court actually *had* declined to hear the petitioner's claims, a case in which the state court certainly *would have* declined to hear those claims raises identical procedural default issues. *See Szuchon*, 273 F.3d at 323-24 n.14.

[7]Slutzker does not argue that there was a "fundamental miscarriage of justice," which in the ordinary case requires a petitioner to establish "actual innocence" by proving "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). Given the quantity of evidence that the Commonwealth has produced to incriminate Slutzker, we have significant doubts that he could meet this stringent standard. At all events, we are required to address other possible grounds for excusing procedural default before examining "actual innocence." *See Dretke v. Haley*, — U.S. —, 124 S. Ct. 1847, 1852 (2004).

11

The first step in establishing cause and prejudice is to establish cause, i.e., "some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). We find that the unusual procedural posture of Slutzker's petition constitutes such an objective, external factor.

### a. The Statute of Limitations

When he received the previously undisclosed police reports, Slutzker had exhausted his PCRA appeals and had a pro se habeas corpus petition pending before the District Court. If he had amended his habeas petition to include the *Brady* claim, and simultaneously brought a second PCRA petition on this issue, his entire habeas petition would have been dismissed for failure to exhaust. *Rose v. Lundy*, 455 U.S. at 522. While this dismissal would have been without prejudice, and would have allowed re-filing, Slutzker's eventual re-filing would have been time-barred by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA provides a one-year limitations period for habeas corpus review of state convictions. 28 U.S.C. § 2244(d)(1). This period runs from the date that the conviction becomes final, § 2244(d)(1)(A), or the date on which the factual predicate of the claim could have been discovered, § 2244(d)(1)(D), and is tolled during the pendency of a properly filed application for state collateral review, § 2244(d)(2).[8]

The statute of limitations on Slutzker's *Brady* claim began

---

[8]Section 2244(d)(1) also identifies two other possible start dates for the statute of limitations—the date on which any state-created impediment to habeas filing ends, § 2244(d)(1)(B), or the date on which a retroactively applicable constitutional right is first recognized by the Supreme Court, § 2244(d)(1)(C)—which are not relevant here.

Because Slutzker's conviction became final in 1994, prior to the April 24, 1996, effective date of AEDPA, he had until April 23, 1997 to file a habeas petition. *Burns v. Morton*, 134 F.3d 109, 111 (3d Cir. 1998). This period was tolled by his first PCRA petition from January 1996 through November 1999, and Slutzker filed his federal petition in December 1999. Thus, when he filed his habeas petition, Slutzker had essentially a full year of the statute of limitations remaining.

12

running on September 11, 2001, when he received the police reports.[9] The statute on Slutzker's other claims, however, began running on the April 24, 1996, effective date of AEDPA, though it was tolled by his first PCRA petition from January 1996 through November 1999. *See supra* note 8; *see also Fielder v. Varner*, 379 F.3d 113, 118 (3d Cir. 2004) (finding that the AEDPA statute of limitations should be applied on a claim-by-claim basis). The statute was *not*, however, tolled during the pendency of Slutzker's habeas petition from December 1999 through his discovery of the *Brady* documents in September 2001. This is the teaching of *Duncan v. Walker*, 533 U.S. 167, 172-73 (2001), which held that a previous habeas corpus petition that has been dismissed without prejudice for failure to exhaust does not toll the AEDPA statute of limitations for a later habeas petition. At the time he discovered the *Brady* documents, Slutzker's habeas petition had been pending for nearly two years; had it been dismissed, even without prejudice, his claims would have been forever barred by § 2244(d).

### b. The Stay-and-Abey Possibility

The Commonwealth argues, citing *Merritt v. Blaine*, 326 F.3d 157 (3d Cir. 2003), that Slutzker could have amended his federal petition to assert the *Brady* claim, and then "requested that the current Petition for Writ of Habeas Corpus be stayed until the completion of state review of his claim." We do not find this argument compelling. Slutzker certainly could have *requested* such a stay, but in the fall of 2001 there was significant doubt that he would have received one, or that if he did it would be upheld on appeal. *Merritt* itself was decided some nineteen months after

---

[9]Of course, the statute of limitations starts running from "the date on which the factual predicate of the claim or claims presented *could have been discovered* through the exercise of due diligence," § 2244(d)(1)(D) (emphasis added), not the date on which the factual predicate actually was discovered. *See Schlueter v. Varner*, 384 F.3d 69, 74 (3d Cir. 2004). On the record before us, we cannot be sure whether Slutzker "could have" discovered the *Brady* materials prior to September 11, 2001. But we note that, in general, Slutzker has been a paragon of due diligence, and the Commonwealth has not disputed that the *Brady* claim is timely.

13

Slutzker received the police reports, and did not squarely hold that such a "stay and abey" procedure was appropriate. Instead, it merely noted in a footnote that

> when petitioners have filed habeas actions in federal courts before they have fully exhausted their state remedies, many federal courts have suggested that the federal actions should be stayed to give the petitioners an opportunity to file their state action because an outright dismissal, even without prejudice, could jeopardize the timeliness of a collateral attack.

326 F.3d at 170 n.10. Not until *Crews v. Horn*, 360 F.3d 146, 151-52 (3d Cir. 2004), did we specifically hold that "[s]taying a habeas petition pending exhaustion of state remedies is a permissible and effective way to avoid barring from federal court a petitioner who timely files a mixed petition."

In *Crews*, we relied on Justice Stevens's concurrence in *Duncan v. Walker*, 533 U.S. at 182-83, which stated that "in our post-AEDPA world there is no reason why a district court should not retain jurisdiction over a meritorious claim and stay further proceedings pending the complete exhaustion of state remedies." *Walker* was decided in June 2001; four Justices agreed that mixed habeas petitions should be stayed rather than dismissed, while the other five did not discuss the issue. Most of the Courts of Appeals have held, before and after *Duncan*, that District Courts could stay mixed petitions when dismissal might render them untimely. *See, e.g.*, *Neverson v. Bissonnette*, 261 F.3d 120, 126 n.3 (1st Cir. 2001); *Zarvela v. Artuz*, 254 F.3d 374, 380-82 (2d Cir. 2001); *Mackall v. Angelone*, 131 F.3d 442, 445 (4th Cir. 1997); *Brewer v. Johnson*, 139 F.3d 491, 493 (5th Cir. 1998); *Palmer v. Carlton*, 276 F.3d 777, 781 (6th Cir. 2002); *Freeman v. Page*, 208 F.3d 572, 577 (7th Cir. 2000); *Calderon v. United States Dist. Court for the N. Dist. of Calif.*, 134 F.3d 981 (9th Cir. 1998).

Many of these cases from other Circuits were decided before Slutzker received his *Brady* materials, so a conscientious attorney in Slutzker's position might have considered the "stay-and-abey" procedure as a possibility. (Slutzker was, of course, proceeding pro se at the time.) But before *Crews*, or at least *Merritt*, there was no Supreme Court or Third Circuit precedent approving this

procedure.[10] Moreover, one Court of Appeals, the Eighth Circuit, had held that a District Court lacked the power to stay habeas cases pending state-court resolution of unexhausted claims. *Carmichael v. White*, 163 F.3d 1044 (8th Cir. 1998).[11] Even a prompt request for a stay would thus have carried the risk that the stay might be overturned on appeal, if we had chosen to follow the reasoning of *Carmichael*. If a stay were granted and then overturned, Slutzker's claims would be dismissed under *Rose v. Lundy* as not fully exhausted, his limitations period would run, and all of his non-*Brady* habeas claims would become untimely.

### c. Parallel Proceedings

As just explained, Slutzker would have been at grave risk if he had amended his habeas petition to include the *Brady* claim, and either dismissed or had that petition stayed to exhaust the claim in

---

[10]Nor had any District Court in this Circuit allowed the procedure. In *Beasley v. Fulcomer*, Civ. A. No. 90-4711, 1991 WL 64586 (E.D. Pa. Apr. 22, 1991), a somewhat analogous pre-AEDPA case, the Eastern District of Pennsylvania held a mixed habeas petition in abeyance, rather than dismissing it, because the petitioner was under a death sentence and this procedure would allow the District Court to continue its stay of execution until the state claims were resolved. But *Beasley* was not controlling precedent, and would not apply to Slutzker in any case because he did not face the death penalty. Furthermore, this Court's decision in *Christy v. Horn*, 115 F.3d 201, 206-07 (3d Cir. 1997), cast some doubt on the vitality of *Beasley*, dismissing rather than staying a mixed petition because we found that there was no danger that the petitioner would be executed during the pendency of his state court proceedings. We have not discovered any other pre-*Merritt* District Court decisions in this Circuit approving anything resembling the "stay and abey" procedure.

[11]The Eighth Circuit's refusal to stay mixed habeas petitions—and, thus, the validity of the other Circuits' willingness to do so—is currently under review by the Supreme Court. *See Rhines v. Weber*, 346 F.3d 799 (8th Cir. 2003), *cert. granted*, — U.S. —, 124 S. Ct. 2905 (2004); *cf. Pliler v. Ford*, — U.S. —, 124 S. Ct. 2441, 2446 (2004) (declining to "address[] the propriety of [the] stay-and-abeyance procedure").

15

state courts. A third, and just as unappealing, option might have been for Slutzker to proceed separately with his unamended habeas petition, while separately bringing a second PCRA petition on the habeas claims. We have allowed state prisoners to seek federal habeas corpus relief while they also pursue state remedies on claims that are unrelated to their habeas claims. *See Pringle v. Court of Common Pleas*, 744 F.2d 297, 300 (3d Cir. 1984) (reversing dismissal of a habeas petition where petitioner was pursuing a parallel state appeal of a state-law sentencing issue); *cf. Tillett v. Freeman*, 868 F.2d 106 (3d Cir. 1989) (reversing dismissal of a habeas petition that included an unexhausted claim cognizable only under state law). But these cases involved petitioners with fully exhausted federal claims, who brought their habeas petitions in parallel with state proceedings based solely on state law. Thus, we found that "none of the purposes attributed by the *Rose v. Lundy* opinion as support for its exhaustion rule have any application," *Tillett*, 868 F.2d at 108, and held only that the exhaustion requirement of *Fay* and *Rose* "is not controlling when the unexhausted claim in question is one of state law," *Pringle*, 744 F.2d at 300. As the unexhausted claim here is one of federal law, *Pringle* and *Tillett* provide only attenuated support for the view that Slutzker could have pursued parallel federal habeas corpus and state PCRA petitions.

Even if this option was available, however, it would have presented dangers similar to those involved in staying or dismissing his entire petition. If Slutzker had been able to exhaust his *Brady* claim in state court while still litigating his remaining habeas claims in federal court, and if he had been denied PCRA relief on the *Brady* claim, any attempt to seek federal habeas review of that claim would be a "second or successive habeas corpus application" under 28 U.S.C. § 2244(b). *See Rose v. Lundy*, 455 U.S. at 520-21. For Slutzker to bring such a second habeas petition, he would have to petition this Court for leave to file the second petition, § 2244(b)(3), and demonstrate that "the facts underlying the claim, if proven, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense," § 2244(b)(2)(B)(ii). We doubt that Slutzker could have met such a stringent standard. *See supra* note 7.

Thus, even if Slutzker had been able to pursue his exhausted

habeas claims in federal court while simultaneously exhausting his *Brady* claim in state court, doing so would nonetheless have essentially denied him the chance to receive any federal review of that claim, because it would be subject to the heightened barrier of § 2244(b).

d. Conclusion

When Slutzker received the *Brady* materials, then, he had four choices, none of them attractive. He could file a second PCRA petition on the *Brady* issue, see his pending habeas petition dismissed under *Rose v. Lundy*, and give up on all of his other habeas claims, which would immediately become time-barred. He could request a stay in his habeas proceeding, despite the lack of any Third Circuit precedent allowing such a stay, and risk untimeliness on all of his claims if such a stay was not granted and upheld on appeal. He could possibly attempt to proceed in parallel, in federal court on his exhausted habeas claims and in state court on his new *Brady* claim—an untried course that would eliminate any real possibility of federal review of the *Brady* issue. Or he could continue in federal court and procedurally default under the PCRA's time limits. Slutzker chose the final option.

We find that this difficult choice among four options, each of which would endanger Slutzker's ability to obtain habeas review of all of his claims, constituted ample external cause for Slutzker's default. While the Supreme Court has never "attempt[ed] an exhaustive catalog of such objective impediments to compliance," *Murray v. Carrier*, 477 U.S. at 488, it has suggested that there are at least two common categories: "a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impractical," *id.* (citations and internal quotation marks omitted). The situation facing Slutzker fits within both of these categories.

On the one hand, it is the Commonwealth's own failure to disclose the *Brady* material that led to Slutzker's dilemma. By waiting to disclose this material until after Slutzker had filed his federal habeas petition and until that proceeding had been pending for two years, the Commonwealth put him in a position where he could not comply with the applicable state limitation and federal exhaustion law without losing, or at least seriously jeopardizing,

17

his right to federal review of all of his constitutional claims.

On the other hand, Slutzker's difficulties were also due directly to the unsettled state of our case law: thus, the legal basis for his claim was in a very real sense unavailable. Of course, there is no argument that Slutzker's *Brady* claim was not legally available in September of 2001: *Brady* itself had been the law of the land for nearly forty years, and the newly discovered police reports were factually sufficient to make out a *Brady* claim. But the legal posture of Slutzker's petition might well have rendered relief unavailable to him, and the fact that he could make out a *Brady* claim would have done him little good if he had no way of actually obtaining review of that claim.

Thus, because of the Commonwealth's failure to disclose the police reports in a timely fashion, and because of the legal difficulties inherent in raising the *Brady* claim in September of 2001, we find that Slutzker has demonstrated cause for his procedural default. As the law of this Circuit did not yet allow Slutzker to stay his pending habeas corpus petition, and as dismissing that petition would render a re-filing untimely, Slutzker faced an "objective impediment" to filing a second PCRA petition in state court.[12]

There remains the question of prejudice stemming from Slutzker's default. The analysis of prejudice for the procedural default of a *Brady* claim is identical to the analysis of materiality under *Brady* itself. *Strickler v. Greene*, 527 U.S. 263, 282 (1999); *see also Banks v. Dretke*, 540 U.S. 668, —, 124 S. Ct. 1256, 1276

---

[12]This conclusion does not depend upon Slutzker's pro se status, as even an experienced attorney would have found no appealing alternative to procedural default here. Thus this case is readily distinguishable from *Caswell v. Ryan*, 953 F.2d 853, 862 (3d Cir. 1992). In *Caswell*, we noted that the *Murray v. Carrier* definition of cause, requiring an "objective factor external to the defense," applied to pro se as well as represented petitioners, and held that a pro se petitioner's failure to file a timely petition for allocatur in the Pennsylvania courts was a procedural default unexcused by cause and prejudice. But Caswell missed a PCRA deadline due to mere inadvertence or negligence, whereas Slutzker defaulted because he had a pending federal habeas petition, which could have been jeopardized by bringing a new state petition.

18

(2004). If the withheld evidence was material to Slutzker's trial, then barring his petition on procedural grounds would create prejudice. We therefore turn to the merits of the *Brady* claim; we discuss materiality under *Brady*, and thus prejudice for the procedural default, in Part II.C.2, *infra*. As will appear, we find that there was in fact prejudice, and we conclude that Sluztker has demonstrated cause and prejudice sufficient to excuse his procedural default.

## C. The Merits of the *Brady* Claim

It is clearly established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). *Brady* thus envisions two requirements for overturning a verdict: (1) that evidence in the possession of the government was actually suppressed, and (2) that the suppressed evidence was material. In this case, the Commonwealth disputes both prongs of this test.

Because of Slutzker's failure to bring this claim before any Pennsylvania court, there is no state court decision on the merits of the *Brady* claim to which we owe deference under AEDPA. *See infra* Part III. We therefore analyze the issue *de novo*.

### 1. Withholding of evidence

First, the Commonwealth argues that there is no proof that the twenty-one police reports that Slutzker received on September 11, 2001, had actually been withheld from him at his original trial. The Assistant District Attorney who had prosecuted Slutzker at his 1991-1992 trial stated, during Slutzker's 1997 PCRA hearing, that she had turned over all documents in her possession, and that this was her common practice.

Slutzker, however, offers substantial evidence that the documents were not, in fact, turned over prior to trial. While Slutzker's trial attorney, Charles Scarlata, died prior to September 2001, his PCRA attorney, Chris Eyster, has represented that the twenty-one disputed police reports were not in Scarlata's file when Eyster reviewed that file in developing the PCRA petition. Also probative is the fact that Scarlata, at trial, stated that Cynthia

19

DeMann was "interviewed twice" and "failed to identify" Slutzker. One of the disputed reports was of a *third* interview with Mrs. DeMann, in which she not only "failed to identify" Slutzker, but in fact positively stated that the man she saw was *not* Slutzker, and was significantly shorter than Slutzker. Scarlata never impeached Mrs. DeMann with these statements, though she was a crucial prosecution witness and he had impeached her with her prior failures to identify Slutzker. We view this omission as significant evidence that Scarlata did not, in fact, have the third DeMann report at the time of Slutzker's trial.

We are therefore not at all convinced by the Commonwealth's contention that the disputed reports had been turned over to the defense prior to trial. The Commonwealth's only evidence for this claim is a general statement by the prosecutor that it was her practice to turn over evidence to the defense; against this, there is both testimonial and circumstantial evidence indicating that the defense did not have access to the reports. It seems clear enough that Slutzker did not have access to the police reports before trial, and therefore that the first *Brady* prong is satisfied.[13]

## 2. Materiality

We next consider whether the suppressed police reports

---

[13]There is a surprising dearth of precedent regarding the burden of proof of nondisclosure of *Brady* evidence. *But see United States. v. Earnest*, 129 F.3d 906, 910 (7th Cir. 1997) ("To be entitled to relief under *Brady*, *the defendant must establish* 1) that the prosecution suppressed evidence; 2) that the evidence was favorable to the defense; and 3) that the evidence was material to an issue at trial." (internal quotation marks omitted and emphasis added)). We note that, in general, the prosecution is more likely to have knowledge of the contents of its files; traditionally, the burden of proof is allocated to the party that is better able to inform itself about the issue. *Cf. Campbell v. United States*, 365 U.S. 85, 96 (1961) ("[T]he ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary."). Nonetheless we need not decide this issue here, as Slutzker's showing that the reports were withheld is convincing, and the Commonwealth has not put forward any forceful evidence to the contrary.

were "material either to guilt or to punishment." *Brady*, 373 U.S. at 87. The Supreme Court has elucidated the *Brady* materiality standard as follows:

> [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Evidence that tends to impeach prosecution witnesses may be material under this standard. *United States v. Bagley*, 473 U.S. 667, 676 (1985).

The District Court here found that two of the undisclosed police reports were material. The first of these was the January 15, 1976, Cynthia DeMann interview. As noted above, Mrs. DeMann stated in this interview that the man she saw speaking to Arlene Mudd after the murder was not Slutzker, but was significantly shorter than Slutzker. At trial, fifteen years later, Mrs. DeMann testified that this man was, in fact, Slutzker; hence there is little doubt that the January 15 report constitutes material impeachment evidence. It directly contradicts Mrs. DeMann's trial testimony. While the defense was able to impeach Mrs. DeMann with two other police reports in which she failed to identify the man she saw speaking with Arlene Mudd, there is a significant difference between a failure to identify Slutzker and a definitive statement that the man she saw was not Slutzker. The latter is much more convincing impeachment evidence, and the failure to disclose it leaves us in doubt that the trial verdict was worthy of confidence.

This is particularly true because Mrs. DeMann was perhaps the only credible eyewitness who testified to seeing Slutzker near the scene of the crime. The other three witnesses may not have been as believable to the jury as Mrs. DeMann. John Mudd Jr., who was five years old at the time of the murder, testified to "recovered memories" whose authenticity was strenuously disputed, and had obvious incentives to incriminate Slutzker. Amy Slutzker, who was six years old at the time of the murder and remembered nothing else from that time of her life, also spoke of dubious memories, and was obviously long estranged from her father. Officer Timothy Brendlinger, who did not know Slutzker's appearance as well as

Mrs. DeMann did, was himself impeached at trial by the testimony of his partner, Officer Mangano, and by the contents of a report that he had made at the time of the murder. Officer Brendlinger's report failed to mention seeing Arlene Mudd talking to anyone outside of her house on the night of the murder, and Officer Mangano testified that Brendlinger had not mentioned his identification of Slutzker at the time.

As the Magistrate Judge put it, Mrs. DeMann "was the only [eyewitness] who was truly a disinterested party, in that she had no relation to the Commonwealth, the victim or the Petitioner." Thus we find that denying Slutzker the opportunity to impeach her with her January 15 statement materially impacted the fairness of his trial.[14] Although the Commonwealth presented significant evidence against Slutzker, the case for convicting him was far from overwhelming. The eyewitness accounts placing him at the scene were questionable, and the circumstantial evidence, while certainly incriminating, was also consistent with other conclusions—including that Arlene Mudd herself, or someone else acting at her behest, killed Mudd. If Slutzker had had a fair opportunity to impeach the most reliable eyewitness, the outcome of his trial might well have been different.

In sum, we agree with the District Court that the police report describing Cynthia DeMann's January 15, 1976, interview

---

[14]The District Court also found that the statements of Dennis and Susan Ward, two other neighbors of the Mudds, were material. We cannot agree. The District Court read the Wards' statements to "suggest that the unidentified man trying to calm Mrs. Mudd down outside her house, was actually Mrs. Mudd's neighbor, Mr. Ward, not Petitioner," and determined that Slutzker's attorney would have called them to testify at trial if he had had access to the report. In fact, however, Mr. Ward told the police that he spoke to Mrs. Mudd in front of his own house at least ten minutes after the murder—not in front of the Mudd house immediately after the murder. The Wards also made a number of statements indicating that they believed Slutzker was involved in the murder. We therefore do not agree either that the defense would likely have called the Wards, or that their testimony would have proven helpful to the defense. Furthermore, we agree with the District Court that the remainder of the police reports do not meet the standard of materiality, for essentially the reasons set forth in the Magistrate Judge's Report and Recommendations.

was material evidence, and that the Commonwealth's failure to disclose it constituted a violation of due process. We reiterate that this conclusion also bears on our procedural default analysis: because we find that the report was material, we also find that prejudice would result from Slutzker's procedural default. *See supra* Part II.B.3.d.

## III. The Fifth Amendment Claim

In addition, we review the trial court's refusal to compel Arlene Mudd (now Arlene Mudd Stewart) to testify. Arlene Mudd testified at the 1976 coroner's inquest that Slutzker was not present at her house on the night of the murder. But she refused to testify at Slutzker's 1991-1992 trial, invoking her Fifth Amendment rights, and the trial court did not force her to testify.

Because the Pennsylvania trial court considered and rejected Slutzker's demand that Arlene Mudd be compelled to testify, we are limited in our review of that decision by AEDPA. Habeas relief may not be awarded on a claim considered on its merits by a state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Furthermore, the state court's findings of fact "shall be presumed to be correct," and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

There is no doubt that Arlene Mudd had a Fifth Amendment right to refuse to testify. She was herself a suspect in the murder, and in fact originally had been charged as a co-defendant. Her testimony might well have implicated her in the murder. Slutzker argues, however, that Arlene waived the privilege by testifying at the coroner's inquest conducted after the murder in January 1976. We disagree.

The law is clear that "a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details." *Mitchell v. United States*, 526 U.S. 314, 321 (1999) (emphasis added). On the other hand, "[i]t is settled by the overwhelming weight of authority that a person who has waived his privilege of silence in one trial or proceeding is not estopped to assert it as to

23

the same matter in a subsequent trial or proceeding." *In re Neff*, 206 F.2d 149, 152 (3d Cir. 1953) (refusing to compel testimony at trial where witness had testified to the same matter in grand jury proceedings). This is a general rule that would seem to apply with great force to the coroner's inquest. *See generally* Michael A. DiSabatino, Annotation, *Right of Witness in Federal Court To Claim Privilege Against Self-Incrimination After Giving Sworn Evidence on Same Matter in Other Proceedings*, 42 A.L.R. Fed. 793 (collecting cases). Thus, we think it clear that the trial court did not err in refusing to compel Arlene Mudd's testimony.

The District Court's thorough analysis of this issue focused on the absence of any Supreme Court decision that directly addresses whether a waiver of the Fifth Amendment privilege in one proceeding waives the privilege in future proceedings, though it mentioned in a footnote that the question is settled among the Circuit Courts. The absence of such Supreme Court precedent is sufficient to deny habeas relief on this grounds: as there is no Supreme Court case on point, the trial court could not have decided this case contrary to such a precedent, or so unreasonably applied precedent as to fall within the AEDPA requirements. *See* 28 U.S.C. § 2254(d)(1).

We note too that in *United States v. Salerno*, 505 U.S. 317, 319-20 (1992), the Supreme Court seems to have accepted the "hornbook law," *United States v. Fortin*, 685 F.2d 1297, 1299 (11th Cir. 1982), that a witness who testifies before a grand jury may nonetheless invoke his Fifth Amendment privilege if called to testify at trial. *Salerno* concerned the question whether transcripts of the witness's grand jury statements could be admitted at trial when the witness claimed the Fifth Amendment privilege; it did not specifically address whether that assertion of the privilege was proper. The District Court noted that "the *Salerno* Court never considered, nor even discussed, the issue of whether the witness had waived his right to invoke the Fifth Amendment privilege by testifying previously before the grand jury." While this is true, we think it significant that *Salerno* did not question the rule, accepted by this Circuit and most others, that testimony in one proceeding does not bar a witness from asserting the Fifth Amendment privilege in a separate proceeding.

Therefore, we hold that Arlene Mudd's testimony at a coroner's inquest did not waive her Fifth Amendment right against

self-incrimination in a criminal prosecution conducted fifteen years later, and we decline to grant habeas relief on this basis.

## IV. The Ineffective Assistance Claim

The District Court also granted habeas relief on the ground that Charles Scarlata, Slutzker's trial lawyer, provided constitutionally ineffective assistance in violation of Slutzker's Sixth Amendment right to counsel. The basis for this determination was the fact that Scarlata had not called Slutzker's friends Janet and Patrick O'Dea as alibi witnesses at Slutzker's trial, nor had he interviewed them in preparing for trial. Slutzker argues that the O'Deas would have provided compelling alibi testimony that could have changed the outcome of his trial. The Commonwealth, on the other hand, contends that Scarlata's decision not to call or interview the O'Deas was a sound tactical judgment, and that they would have been subject to impeachment about their personal involvement in or knowledge of the murder that would have proven disastrous to Slutzker's defense.

Inasmuch as we are affirming the grant of habeas corpus because of the failure to provide the defendant with the *Brady* material, we do not find it necessary to reach the District Court's decision on the ineffective assistance claim. The legal standards in this area are somewhat unsettled, in part because one of our recent decisions, holding that an attorney's decision not to interview all possibly relevant witnesses does not necessarily constitute ineffective assistance, is being reviewed by the Supreme Court. *See Rompilla v. Horn*, 355 F.3d 233 (3d Cir. 2004), *cert. granted*, *Rompilla v. Beard*, 125 S. Ct. 27 (Sept. 28, 2004). Therefore, we find it prudent to avoid ruling on the District Court's decision on this issue.

## V. Conclusion

For the foregoing reasons, we will affirm the order of the District Court granting habeas corpus relief on the ground that the prosecution's failure to disclose the twenty-one police reports denied Slutzker due process. We will also affirm the denial of habeas relief for the trial court's failure to compel Arlene Mudd to testify.

The parties expend much energy in debating the ambiguity of the District Court's order, which stated only "that the petition for writ of habeas corpus is GRANTED" without specifying the exact form of relief provided. We therefore will modify that order to require the Commonwealth to release Slutzker unless it retries him within 120 days. *See Herrera v. Collins*, 506 U.S. 390, 403 (1993) ("The typical relief granted in federal habeas corpus is a conditional order of release unless the State elects to retry the successful habeas petitioner . . . .").