**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-9005
_____

JAMES LAMBERT,
                              Appellant

v.

JEFFREY BEARD, COMMISSIONER, PENNSYLVANIA
DEPARTMENT OF CORRECTIONS; WILLIAM
STRICKMAN, III, SUPERINTENDENT OF THE STATE
CORRECTIONAL INSTITUTION AT GREENE; THE
DISTRICT ATTORNEY OF THE COUNTY OF
PHILADELPHIA; THE ATTORNEY GENERAL OF THE
STATE OF PENNSYLVANIA
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA
(D.C. Civil No. 02-cv-09034)
District Judge:  Honorable Michael M. Baylson
_____

Argued:  September 30, 2010
_____

Before: BARRY, HARDIMAN and STAPLETON,
Circuit Judges

(Opinion Filed: February 7, 2011)
_____

Stuart B. Lev, Esq. (Argued)
Defender Association of Philadelphia
Federal Capital Habeas Corpus Unit
The Curtis Center, Suite 545 West

Independence Square West
Philadelphia, PA 19106-0000
        -and

Daniel Silverman, Esq.
Suite 1001
1429 Walnut Street
Philadelphia, PA 19102-0000

Counsel for Appellant


Joshua S. Goldwert, Esq. (Argued)
Thomas W. Dolgenos, Esq.
Office of the District Attorney
Three South Penn Square
Philadelphia, PA 19107

Counsel for Appellees

_____

OPINION OF THE COURT
_____


BARRY, Circuit Judge

## I. **Introduction**

We have approached this case with the utmost seriousness. We are humbled by the fact that over a twenty-eight-year period of time, the case has progressed through courts of the Commonwealth of Pennsylvania and the U.S. District Court without James Lambert having been granted relief. We, nonetheless, must decide this case consistent with what we believe our obligation to be, while according the utmost respect to the standard of review that we are required to apply. Having done so, we now vacate the judgment of the District Court dated July 24, 2007, and remand this matter to

2

the District Court, which is directed to conditionally grant the petition for a writ of habeas corpus.  If, within 120 days of the date of this Opinion and Order, the Commonwealth fails to retry Mr. Lambert, he shall be released.[1]

## II. **Procedural History**

It is not an overstatement to say that the procedural history of this case is extensive in the extreme, as would be expected in a case that has spanned more than twenty-eight years.  We have carefully examined the numerous issues Lambert has raised over these many years and how the various courts have resolved those issues.  We, however, decide this case on one issue, an issue under *Brady v. Maryland*, 373 U.S. 83 (1963), and find it unnecessary to address the other issues raised to us or the issues raised to the courts that preceded us.  So, too, only a summary of the procedural history that does not pertain to the *Brady* issue will suffice.

James Lambert and Bruce Reese were arrested and charged with murder, robbery, criminal conspiracy, and possession of an instrument of crime based on what the Commonwealth had been told by one Bernard Jackson, who subsequently testified for the Commonwealth in exchange for an open guilty plea to third-degree murder, robbery, conspiracy, and several unrelated crimes.  On April 25, 1984, Lambert was convicted by a jury of two counts of first-degree murder as well as the other crimes with which he was charged, and was sentenced to death.  Reese was convicted of second-degree murder, and was sentenced to life imprisonment.

---

[1]  Given this disposition, our order of November 23, 2010, which vacated the sentence of death given our conclusion that the jury instructions violated *Mills v. Maryland*, 486 U.S. 367 (1988), is now moot and will be vacated, and the Commonwealth's petition for panel rehearing and rehearing en banc as to that order will be denied as moot.

3

Lambert moved for a new trial and to vacate the judgment, motions which were denied.  He appealed, and in a 3-2 decision with two Justices not participating, the Pennsylvania Supreme Court upheld his conviction and affirmed the sentence of death.  *See Commonwealth v. Lambert*, 603 A.2d 568 (Pa. 1992) ("*Lambert I*").  Lambert next filed a *pro se* Pennsylvania Post-Conviction Relief Act ("PCRA") petition, which was amended by counsel on January 30, 1997, and twice supplemented thereafter.  On January 29, 1998, the PCRA court denied the petition without a hearing.  The Pennsylvania Supreme Court remanded for the PCRA court to write an opinion, which it did on March 4, 2000.  Lambert again appealed, and the Pennsylvania Supreme Court affirmed in an opinion signed by two Justices, with two Justices concurring in the opinion, one concurring in the result, and two dissenting.  *See Commonwealth v. Lambert*, 797 A.2d 232 (Pa. 2001) ("*Lambert II*").  Lambert then filed a second PCRA petition raising, for the first time, a claim under *Brady*, based on recently discovered exculpatory evidence.  That petition was denied as well, and the Pennsylvania Supreme Court again affirmed.  *See Commonwealth v. Lambert*, 884 A.2d 848 (Pa. 2005) ("*Lambert III*").

In 2002, Lambert filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Pennsylvania raising twenty-four claims of constitutional error, most of which were accompanied by related allegations of ineffective assistance of counsel.[2]  The District Court did not conduct an evidentiary hearing and denied relief on all claims, but granted a certificate of appealability ("COA") on one guilt-phase claim relating to the Commonwealth's alleged discriminatory use of peremptory challenges at jury selection in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), and one sentencing-phase claim relating to whether there had been a violation of *Mills*

---

[2]  Lambert's habeas petition was stayed pending exhaustion of the claims raised in that petition in his subsequently filed third PCRA petition.

4

*v. Maryland*, 486 U.S. 367 (1988). *See Lambert v. Beard*, No. 02-9034, 2007 WL 2173390 (E.D. Pa. July 24, 2007).

We then expanded the COA to include the following issues: (1) whether the Commonwealth's failure to disclose exculpatory evidence and misrepresentation of the bargain given to its key witness in exchange for his testimony violated *Brady*; (2) whether Lambert was denied his right to present a defense, call witnesses on his behalf, and confront the evidence against him when he was barred from introducing evidence that Jackson and Reese had a history of committing robberies together and without him; (3) whether Lambert was denied his right to due process and a fair trial when the trial court allowed a witness called by Reese to identify Lambert for the first time in court; (4) whether Lambert was denied his right to due process when the trial court refused to sever his trial from Reese's trial; (5) whether the trial court misled the jury about the role of appellate review in violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985); and (6) whether Lambert's penalty-phase waiver of his right to present mitigating evidence was not knowing, intelligent, and voluntary.

### III. <u>Jurisdiction and Standard of Review</u>

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 2241, and 2254. We have appellate jurisdiction under 28 U.S.C. §§ 1291 and 2253. We exercise plenary review over the decision of the District Court, as the Court did not hold an evidentiary hearing. *See Simmons v. Beard*, 590 F.3d 223, 231 (3d Cir. 2009).

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), where, as here, a habeas petitioner's claims were adjudicated on the merits in state court, our review is limited to determining whether the state court decision was contrary to or involved an unreasonable application of Supreme Court precedent or an unreasonable determination of the facts in light of the evidence presented in the state court. *See* 28 U.S.C. § 2254(d).

5

## IV.  Factual Background

At approximately 9:00 on the evening of September 23, 1982, the robbery of Prince's Lounge went bad, and two patrons were shot to death.   The Philadelphia Police Department commenced an investigation, but the perpetrators could not be identified, although two of the three barmaids working that night gave general descriptions of each of the two perpetrators.   Not long after the murders, however, an anonymous tip was received by the Department identifying Bernard Jackson and "Touche" (later identified as Reese, Jackson's brother-in-law) as the men in the bar that night. Each barmaid was subsequently presented, for the first time, with a photo array that included Jackson's photo.  Sarah Clark identified Jackson as the man who was standing at the top of the stairs in the bar and ordered her to place the money in a bag just before she heard two gunshots from the rear of the bar, the shots that killed the two patrons.  Marie Green was 85 to 90 percent sure that the man at the top of the stairs was Jackson.  Janet Ryan, the third barmaid, was working at the rear of the bar and dropped down and ran to the ladies room when the shooter pointed a gun in her face.

Jackson, who by then was in custody on another charge, learned that he had been identified by at least one of the barmaids and told the police about the Prince's Lounge robbery and that Reese and "another dude," whose name he could not recall, had done it.  His story, at least initially, went as follows.  He and Reese met the "other dude" (whom he much later identified as Lambert) for the first time less than an hour before the three of them decided to rob a bar.  After casing, and rejecting, one bar, Jackson, who admitted to having previously committed at least thirteen armed robberies of bars, made the decision to rob the Prince's Lounge after ascertaining that a female friend of his was not working that night.  Jackson claimed to have waited in the getaway car while Lambert and Reese entered the bar and went upstairs, each armed with a handgun provided by Reese – Lambert was carrying the .32 and Reese the .38, which, as it turned out, was the murder weapon.  Jackson claimed not to have known

6

what happened in the bar aside from what he was told by Reese and Lambert when they returned to the car and fled the scene with Jackson at the wheel.

## V. **Discussion**

It is undisputed that without Jackson's statements to the police, the Commonwealth could not have indicted Lambert on these charges. *See Giglio v. United States*, 405 U.S. 150, 154 (1972) (finding evidence impeaching witness's credibility material, in part, because without the witness's testimony, "there could have been no indictment"). Jackson, however, came burdened with a wealth of impeachment material, not the least of which were four prior inconsistent statements to the police about who did what and who said what on the night in question, and his admitted goal of testifying to save himself from a death sentence – "no doubt about it," he said. (A2180). Predictably, he was savaged at trial. One wonders how the Commonwealth could have based this case of first-degree murder on a Bernard Jackson.

But we digress.

### A.

Jackson's statements of October 14, 1982, October 22, 1982, January 14, 1983, and February 6, 1983 were devastatingly inconsistent with each other and with his story at trial. He initially decided to give the police only "some of the truth" and told the police that Reese had admitted to shooting two people (A2002); then he told the police that Reese said Lambert was the shooter and that Reese was ordering the barmaid to give him the money (A2007, 2013); then he told the police that although he had previously said that Lambert had done it, *that* wasn't true – he was "feeding them a story" when he said that Lambert said he had shot two people and "that was a lie, too." (A2080, 2082, 2100.) *Now*, at trial, he said, he was going to tell the truth. It was Reese, not Lambert, who said that he shot two people, but that wasn't true either because what Reese *really* said was that "I

7

think we killed a couple of guys in there," not that *he* did. (A2253.) Indeed, Jackson was finally forced to admit that three months after the first of his lengthy statements to the police, he was still giving them different versions of what had happened. Still, breathtakingly, at the very end of his testimony, with his credibility hanging, at best, by a thread, and conceding that he was testifying to avoid a death sentence, Jackson somewhat proudly announced that although he had "switched what [Lambert and Reese] did interchangeably," he *always* said that Lambert and Reese were the two men involved – they were "the only two people" he supplied to the police. (A2266-67, 2276.)

But that was simply not so, and neither the defense nor the jury was told that it was not so. In the Police Activity Sheet of October 25, 1982, which first came to light during the PCRA proceedings, Jackson named Lawrence Woodlock as a "co-defendant." (A3334.) The Commonwealth conceded at oral argument before us that the Police Activity Sheet should have been disclosed to the defense prior to trial. Aside from the other arguments made as to why that Police Activity Sheet was significant, there can be no question that given Jackson's consistent position – his *only* consistent position, by his own admission, not to mention the evidence at trial – that the only participants were Lambert and Reese in the bar and Jackson in the car, the naming of another participant could well have destroyed what little was left of his credibility.

The PCRA Court considered whether the Commonwealth's failure to disclose Jackson's statement that there was another participant – a "co-defendant" – was material such that, as the Supreme Court explained, "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999). The PCRA Court denied Lambert's *Brady* claim on the merits, explaining that "[v]iewed in light of the record as a whole, the [Police Activity Sheet of October 25, 1982] is not material." (A227). It concluded that "Jackson was

8

comprehensively impeached by the defendant and co-defendant Reese at trial," and "[d]espite being impeached on prior inconsistencies and lies to police, the jury [sic] determined Jackson to be credible." (A228.) The Pennsylvania Supreme Court agreed, explaining that the Police Activity Sheet of October 25, 1982

> would not have materially furthered the impeachment of Jackson at trial as he was already extensively impeached by both appellant and Reese. Indeed, each codefendant cross-examined Jackson on the following: every inconsistency in his four police statements; that he was testifying on behalf of the Commonwealth pursuant to a plea bargain; and that he had several open robbery charges still pending and his testimony was motivated by a desire to receive lenient sentences for those crimes. Any additional impeachment of Jackson arising from a police notation would have been cumulative. Accordingly, the Commonwealth did not violate *Brady* by not disclosing this police activity sheet as appellant has failed to show its materiality.

*Lambert III*, 884 A.2d at 855-56. The District Court did not mention the Police Activity Sheet of October 25, 1982 in its Opinion, instead treating it as just one among the host of other items the Commonwealth had not disclosed and concluding that the Pennsylvania Supreme Court's disposition of Lambert's *Brady* claim was a reasonable application of federal law. *See Lambert v. Beard*, 2007 WL 2173390, at *10.

### B.

"[O]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (alterations and internal quotation marks omitted). Nevertheless, AEDPA created a "new, highly deferential standard for evaluating

9

state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997). That statute bars a federal court from granting habeas relief unless the state court's adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "[T]he cutoff date for determining 'clearly established Federal law' for purposes of § 2254(d)(1) is the date of the relevant state-court decision." *Greene v. Palakovich*, 606 F.3d 85, 99 (3d Cir. 2010).

"A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision involving an unreasonable application of clearly established Federal law." *Williams v. Taylor*, 529 U.S. 362, 407-08 (2000) (internal quotation marks and alterations omitted). While the term "unreasonable" is "no doubt difficult to define," "the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410. "Under § 2254(d)(1)'s unreasonable application clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411 (internal quotation marks omitted). "The unreasonable application test is an objective one – a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly." *Jacobs v. Horn*, 395 F.3d 92, 100 (3d Cir. 2005). As the Supreme Court has recently explained, "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree on the correctness of the state court's decision.'" *Harrington v. Richter*, No. 09-587, slip op. at 11 (U.S. Jan. 19, 2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). We have with "painstaking care" reviewed this case with this explanation in mind and have

10

found constitutional error. It is our duty to correct it. *See Kyles*, 514 U.S. at 422.

## C.

In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S at 87. The Supreme Court has clarified that material information must be disclosed even absent a defense request, *United States v. Bagley*, 473 U.S. 667, 682 (1985), and that the *Brady* rule applies to impeachment evidence as well as directly exculpatory evidence, *id.* at 676.

Information is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (internal quotation marks omitted). "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ." *Kyles*, 514 U.S. at 434. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*

The Supreme Court of Pennsylvania ruled that the Police Activity Sheet of October 25, 1982 was immaterial because Jackson was so thoroughly impeached that, ipso facto, additional evidence could not have made a difference. To be sure, "impeachment evidence, if cumulative of *similar* impeachment evidence used at trial . . . is superfluous and therefore has little, if any, probative value." *Conley v. United States*, 415 F.3d 183, 189 (1st Cir. 2005) (emphasis in

11

original); *see also United States v. Boone*, 279 F.3d 163, 191 (3d Cir. 2002) (finding no *Brady* violation where another witness testified to the same supposedly exculpatory information); *Tankleff v. Senkowski*, 135 F.3d 235, 251 (2d Cir. 1998) ("When a witness's credibility has already been substantially called into question *in the same respects* by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a *Brady* claim." (emphasis added)).

Yet it is patently unreasonable to presume – without explanation – that whenever a witness is impeached in one manner, any other impeachment becomes immaterial. In a similar context, the Supreme Court has rejected such an argument. In *Napue v. Illinois*, 360 U.S. 264 (1959), a prosecutor knowingly elicited false testimony that a cooperating government witness had not, in fact, been promised consideration in exchange for his testimony. Rejecting the government's argument that the defense had numerous other ways in which to impeach the witness, the Court held that it "[did] not believe that the fact that the jury was apprised of other grounds for believing that the witness . . . may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one." *Id.* at 270.

The logic of *Napue* has been extended to the *Brady* context, both by the Supreme Court of the United States and by various federal courts of appeals. In *Banks v. Dretke*, 540 U.S. 668 (2004), the Supreme Court rejected the state's argument that no *Brady* violation had occurred because the witness "was heavily impeached at trial" and thus that his status as a paid informant would have been "merely cumulative." *Id.* at 702 (alterations omitted). Finding that no other impeachment evidence was "directly relevant" to the witness's status as an informant, the Court ruled that "one could not plausibly deny the existence of the requisite 'reasonable probability of a different result' had the suppressed information been disclosed to the defense." *Id.* at 702-03. *See also Bagley*, 473 U.S. at 689 ("If the testimony

that might have been impeached is weak and also cumulative, corroborative, or tangential, the failure to disclose the impeachment evidence could conceivably be held harmless. But when the testimony is the start and finish of the prosecution's case, and is weak nonetheless, quite a different conclusion must necessarily be drawn.").

We have also recognized that undisclosed *Brady* material that would have provided a different avenue of impeachment is material, even where the witness is otherwise impeached. *See Slutzker v. Johnson*, 393 F.3d 373, 387 (3d Cir. 2004) (holding that although the defendant was able to impeach the prosecution in certain respects, the suppressed information was material under *Brady* because there was a "significant difference" between the suppressed material and the information to which the defense had access); *United States v. Perdomo*, 929 F.2d 967, 969, 972 (3d Cir. 1991) (rejecting the district court finding "that the jury had an opportunity to evaluate the informant's credibility from other damaging testimony" and concluding that "[w]hether or not the jury has had an opportunity to consider other impeachment evidence is not the correct standard for determining materiality of undisclosed information"). *But see Lisa Michelle Lambert v. Blackwell*, 387 F.3d 210, 253 (3d Cir. 2004) ("'Suppressed evidence is not material when it merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.'" (further internal quotation marks omitted) (quoting *United States v. Amiel*, 95 F.3d 135, 145 (2d Cir. 1996))).[3]

---

[3] Unlike in *Lisa Marie Lambert*, the impeachment at issue here is not simply "an additional basis on which to impeach." Rather, as the First Circuit has recognized, "[c]onfidence in the outcome is particularly doubtful when the withheld evidence impeaches a witness whose testimony is uncorroborated and essential to the conviction." *Norton v. Spencer*, 351 F.3d 1, 9 (1st Cir. 2003) (internal quotation marks omitted). Here, the withheld information provided a *unique* basis on which to impeach – specifically, a basis that

Other federal courts of appeals have echoed the conclusion that additional, non-cumulative impeachment material implicates *Brady*. *See United States v. Torres*, 569 F.3d 1277, 1284 (10th Cir. 2009) ("Merely because other impeachment evidence was presented does not mean that additional impeachment evidence is cumulative . . . ."); *Horton v. Mayle*, 408 F.3d 570, 580 (9th Cir. 2005) ("However, that the jury had other reasons to disbelieve McLaurin does not render the suppressed evidence of the deal immaterial.  Evidence that the prosecution promised immunity to induce McLaurin to testify as its star witness is a wholly different kind of impeachment evidence . . . ."); *Reutter v. Solem*, 888 F.2d 578, 581 (8th Cir. 1989) ("The state argues that because Trygstad was a convicted felon his credibility already was suspect and the additional information regarding his petition for commutation and pending hearing thereon would not have affected the jury's judgment as to his truthfulness.  Logic of this kind has been dismissed by the Supreme Court." (citing *Napue*, 360 U.S. at 270)).

What is critical here is that the undisclosed statement by Jackson that there was another participant – a "co-defendant," to use his word – was not just one more piece of impeachment material to be placed in a "so what" category because Jackson had already been so thoroughly impeached. Rather, the undisclosed Police Activity Sheet would have opened an entirely new line of impeachment, and would have done far more than simply allow the defense to point out — as it did — that Jackson was inconsistent and often changed his story.  The way we know that the undisclosed statement would have opened a new line of impeachment is that by not disclosing it, the prosecution was able to rely on Jackson's consistency in naming Reese and Lambert as the perpetrators, the *only* point on which he was consistent at trial.  The Supreme Court has instructed that we may take the Commonwealth at its word that this was important.  *See Kyles*, 514 U.S. at 444 ("The likely damage is best understood

shredded Jackson's credibility on the one point on which the jury could have inferred that he had any credibility.

by taking the word of the prosecutor, who contended during closing arguments that Smallwood and Williams were the State's two best witnesses."). Here, the prosecution's closing argument emphasized Jackson's consistency in naming Lambert and Reese as the perpetrators. (A3115.) No more, in our view, need be said to make clear that finding that Lambert had not met the requirements of *Brady* was an unreasonable application of clearly established Supreme Court precedent.

In closing, we cannot help but observe that the evidence is very strong that Reese, not Lambert, was the shooter, even assuming that Lambert (and not Jackson, as two of the barmaids testified) was in the Prince's Lounge that night. First, it is undisputed that the .38 was the murder weapon, that the .38 was Reese's gun and carried by him that night, and that Lambert (*if* he was there) had only the .32. Second, all three barmaids described the shooter as no more than 5'7". Reese is 5'7"; Lambert is 6' to 6'1". Third, the testimony of Janet Ryan, the barmaid who suddenly remembered Lambert as having put the gun in her face, identifying him on Reese's case only "from the nose up" (although she told the police at the time of the murders that she "didn't even get a look at the man") after failing to identify him on the Commonwealth's case because "nobody asked me," was, in a word, bizarre. (A2824, 2844, 2940-41). These examples are precisely the types of evidence which can undermine a court's faith that the verdict in question is "worthy of confidence." *Kyles*, 514 U.S. at 434. Finally, and for what it is worth (perhaps Jackson saw the havoc his testimony had wrought), we note the post-trial proffer of Jackson's affidavit, in which he says that Reese was the shooter and that Ryan was a friend of Reese's family and would never testify against Reese. The affidavit was rejected by the trial court as untimely and not in proper form. *See Lambert I*, 603 A.2d at 572.

15

## VI. **<u>Conclusion</u>**

The judgment of the District Court is vacated, and this matter is remanded. The District Court is directed to conditionally grant the petition for a writ of habeas corpus. The Commonwealth shall retry Lambert within 120 days. If it fails to do so, Lambert shall be released.