**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1729
_____

JEROME GIBSON,

Appellant

v.

SECRETARY PENNSYLVANIA DEPARTMENT OF CORRECTIONS;
SUPERINTENDENT GREENE SCI;
ATTORNEY GENERAL PENNSYLVANIA;
DISTRICT ATTORNEY BUCKS COUNTY
_____

On Appeal from the United States District Court for the
Eastern District of Pennsylvania
(D.C. No. 2:10-cv-00445)
District Judge:  Hon. Stewart Dalzell

Argued:  December 12, 2017

Before:  CHAGARES, RESTREPO, and FISHER, Circuit Judges.

(Filed: December 22, 2017)

Samuel J.B. Angell (ARGUED)
Arianna J. Freeman
Helen A. Marino
Federal Community Defender Office for the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106

        Counsel for Appellant

Karen A. Diaz
Stephen B. Harris (ARGUED)
Matthew D. Weintraub
Bucks County Office of District Attorney
Bucks County Justice Center
100 North Main Street
Doylestown, PA 18901

      Counsel for Appellees

_____

OPINION[*]
_____

CHAGARES, <u>Circuit</u> <u>Judge</u>.

Defendant Jerome Gibson appeals from the District Court's dismissal of his petition for a writ of habeas corpus, brought under 28 U.S.C. § 2254, seeking relief from his conviction after a jury trial in Pennsylvania state court. Gibson raises claims under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), asserting that the prosecution withheld impeachment evidence concerning numerous witnesses; a claim of ineffective assistance of counsel based on trial counsel's failure to cross-examine a witness about his inability to identify Gibson at a pre-trial lineup; and a cumulative error claim asserting that the combination of all the errors was prejudicial. Because none of these claims have merit, we will affirm.

---

[*] This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

2

I.

We write for the parties and so recount only the facts necessary to our decision. On September 29, 1994, shortly before 3:00 p.m., an assailant robbed and murdered Robert Berger, the owner of Ascher Health Care Center, located on Mill Street in Bristol Borough, Bucks County, Pennsylvania. Berger was shot three times — two .32 caliber projectiles were found in his body — and approximately $1,400 and Berger's .38 caliber handgun were stolen. Two witnesses saw the robbery or its aftermath. Michael Segal, who worked across the street from Ascher Health, saw the assailant struggle with Berger, heard gunshots, and saw the assailant rifle through the cash register. Although unable to see the assailant's face, Segal observed his size and clothing, and testified that Gibson matched that description. The other eyewitness — Alfonso Colon — lived above Ascher Health and testified that after hearing gunshots, he went downstairs and saw Gibson leaving Ascher Health while stuffing what appeared to be a handgun into his pants.

Three days after the murder, detectives from the Bucks County District Attorney's Office interviewed Gibson, who denied that he had been in Bristol Borough on the day of the murder. The detectives, however, had a surveillance photo showing that Gibson had been in a bank in Bristol Borough that morning. On October 6, 1994, Gibson was arrested and charged with the robbery and murder of Berger, a capital offense.

The Commonwealth's theory at trial was that Gibson needed money to buy a new car and so decided to commit a robbery. Various witnesses testified that they saw Gibson on the day of the murder in Bristol Borough and in the vicinity of Ascher Health with a gun and wearing the hooded sweatshirt and baggy pants of the assailant; that Gibson had

3

told them that he planned to commit a robbery and would kill the victim if needed; and that Gibson confessed that he had committed the murder. The jury found Gibson guilty of first-degree murder, robbery, and possession of instruments of crime.

Gibson was sentenced to death, but during his first state post-conviction proceeding under the Pennsylvania Post Conviction Relief Act, ("PCRA"), 42 Pa. Cons. Stat. Ann. §§ 9541–46, his sentence was modified to life in prison in light of the trial court's finding that Gibson was mentally disabled. The remainder of his PCRA petition was denied. Gibson filed his initial habeas petition on January 29, 2010, which he supplemented on November 23, 2011 after uncovering new Brady material. The case was then stayed as Gibson filed a second PCRA petition to exhaust his newly discovered claims. This second petition was denied as untimely, the case returned to federal court, and the Magistrate Judge issued a Report and Recommendation recommending dismissal of the habeas petition. Gibson filed objections, and on February 29, 2016, the District Court dismissed the petition. The court found that the Brady evidence was not cumulatively material and that counsel's assistance was not ineffective. The court also declined to issue a Certificate of Appealability ("COA"). Gibson timely appealed, and we granted a COA on fourteen of his Brady claims, an ineffective assistance of counsel claim, and a cumulative error claim.

II.[1]

We first address Gibson's Brady claims, which relate to eight of the

Commonwealth's witnesses:  Eddie Jones, Glenn Pollard, Cyril Thomas, Paulinda

Moore, Kevin Jones, Eddie Gilbert, Sean Hess, and Herman Carrol.[2]  The District Court

did not conduct an evidentiary hearing, so our review of its Order denying habeas relief is

plenary as to both questions of law and fact.  Slutzker v. Johnson, 393 F.3d 373, 378 (3d

Cir. 2004).[3]  To establish a Brady claim entitling him to relief, Gibson must show that (1)

the "evidence at issue [was] favorable" to him (that is, was exculpatory or impeaching),

(2) the "evidence [was] suppressed by the State, either willfully or inadvertently," and (3)

he was prejudiced because the suppressed evidence was "material."  Strickler v. Greene,

527 U.S. 263, 281–82 (1999); Kyles v. Whitley, 514 U.S. 419, 432–34 (1995).

Under Brady, the prosecution bears an affirmative duty to "to learn of any

favorable evidence known to the others acting on the government's behalf in the case,

---

[1] The District Court had jurisdiction under 28 U.S.C. §§ 2241 and 2254.  We have appellate jurisdiction to review the certified issues under 28 U.S.C. § 2253.

[2] Gibson discusses a Brady violation concerning a ninth witness — Bernard McLean — which the District Court rejected and which was not included in the COA. Gibson asks us to consider it anyway, but has offered no reasoning beyond what he argued when seeking a COA for why we were wrong to exclude McLean, and we find none in the record.  Cf. Gattis v. Snyder, 278 F.3d 222, 225 (3d Cir. 2002).

[3] Normally, when we review a District Court's resolution of a habeas petition that followed a state post-conviction relief process, our de novo review of the petition is constrained by the standards established under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") for review of state court merits decisions.  However, the District Court did not apply AEDPA to the Brady claims and neither party asserts that the District Court erred in failing to do so.  Although parties cannot waive the application of AEDPA deference, see, e.g., Gardner v. Galetka, 568 F.3d 862, 879 (10th Cir. 2009) (collecting cases), we need not undertake the AEDPA analysis in the first instance, because we agree that Gibson's claims fail even under the more exacting de novo review.

including the police," and to provide it to the defense. Kyles, 514 U.S. at 437. Brady and its progeny do not, however, impose a duty upon the prosecutor to uncover and disclose "information possessed by other government agencies that have no involvement in the investigation or prosecution at issue." United States v. Pelullo, 399 F.3d 197, 216 (3d Cir. 2005) (quoting United States v. Merlino, 349 F.3d 144, 154 (3d Cir. 2003)). The question of materiality is assessed in two parts. First, a court must "evaluate the tendency and force of the undisclosed evidence item by item" in order to determine whether it should be considered as part of the materiality analysis. Kyles, 514 U.S. at 436 n.10. Second, it must consider the cumulative effect of all the suppressed evidence to determine whether it together is material. Id. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. The materiality inquiry is not a sufficiency of the evidence test and the fact that enough evidence remains to convict after excluding the tainted evidence is not a reason to deny relief. Kyles, 514 U.S. at 434–35.

The District Court found that the evidence concerning Cyril Thomas and Kevin Jones was not favorable to Gibson and, although concluding that the Commonwealth had suppressed evidence concerning the other six witnesses, determined that those violations were not cumulatively material. Gibson challenges the District Court's determinations regarding Cyril Thomas and Kevin Jones, as well as its cumulative analysis determination. Thus, even though the Commonwealth contests the District Court's

6

determinations regarding the other six witnesses, we need not decide whether the District Court correctly assessed the evidence pertaining to them because — with the exception of the Gilbert material, which we address separately along with the Cyril Thomas and Kevin Jones evidence — we agree that the evidence was not cumulatively material.

A.

1.

Thomas testified at trial that he received a .38 caliber revolver from Gilbert, who in turn had received it from Gibson. Gibson argues that the prosecution withheld (1) a note in Thomas' juvenile probation file indicating that Bucks County Detective John Mullin told the probation officer that if Thomas did not cooperate, then Mullin would charge Thomas with possession of the weapon and (2) evidence that when Thomas was arrested, police found 80 packets of cocaine on him. Gibson says that he could have used this evidence to impeach Thomas' motivations for testifying and to show that the Commonwealth used threats of prosecution to gain cooperation.

The District Court found no evidence suggesting that Thomas was threatened with a weapons charge, and thus rejected Gibson's assertion that the withheld evidence could have impeached Thomas. It further concluded that Gibson's claim based on the cocaine report was untimely under AEDPA because Gibson knew about it in 2001 but failed to raise it in his initial habeas petition, and it did not relate back to the initial petition. We conclude that the District Court did not err in refusing to consider the evidence.

Given no evidence that Thomas himself was threatened with prosecution for possession of a weapon, there is no reason to believe that he was coerced to testify based

7

on that uncommunicated threat, and so it would not be relevant information for impeachment purposes. Moreover, it is unlikely that such evidence would be admissible at trial, given that it relates to uncharged conduct. See Pa. R. Evid. 608(b). Although inadmissible evidence can still be Brady material where it could lead to admissible evidence, Dennis v. Sec'y, Pa. Dep't of Corr., 834 F.3d 263, 309–10 (3d Cir. 2016) (en banc), Gibson has failed to make such a connection. Mere speculation that the suppressed evidence might have led to admissible evidence is insufficient to render otherwise inadmissible evidence into Brady material. See United States v. Agurs, 427 U.S. 97, 109 (1976); United States v. Ramos, 27 F.3d 65, 71 (3d Cir. 1994) ("We think it unwise to infer the existence of Brady material based upon speculation alone.").

With regard to the evidence concerning the cocaine, we agree that its suppression did not violate Brady, but for a reason other than that relied upon by the District Court. See Murray v. Bledsoe, 650 F.3d 246, 247 (3d Cir. 2011) ("We . . . may affirm the District Court's judgment on any basis supported by the record."). Whether or not the claim relates back to Gibson's initial petition, the evidence is cumulative and thus immaterial under Brady. Gibson argues that the evidence could have been used to impeach Thomas and show that he testified in order to avoid facing charges. At trial, the prosecution elicited testimony that Thomas had pending charges of aggravated assault and attempted homicide stemming from the arrest during which the cocaine was found, and Gibson's counsel cross-examined Thomas regarding his cooperation with police while in custody on those charges to "help [himself] out of a bad situation." Appendix ("App.") 704–06. Thomas' substantial motive to cooperate in the face of these serious

8

charges was apparent; that he also might have faced drug charges would not have given him a meaningfully greater incentive to cooperate. Such cumulative impeachment evidence is "superfluous and therefore has little, if any, probative value" and is not to be accorded any weight in our materiality analysis. Lambert v. Beard, 633 F.3d 126, 133 (3d Cir. 2011) (quoting Conley v. United States, 415 F.3d 183, 189 (1st Cir. 2005)), vacated on other grounds, Wetzel v. Lambert, 565 U.S. 520 (2012).

2.

Kevin Jones testified at trial that in the Spring of 1994, Gibson told him that he planned to commit a robbery in Bristol Borough and was prepared to kill the victim. He added that he saw Gibson in Bristol Borough on the day of the murder and that, while in prison a month before Gibson's trial, Gibson confessed to the crime. Gibson claims that the prosecution withheld a report authored by Bucks County Detective Robert Gergal concerning his interview of Eric Jones (Kevin's brother), which notes that Eric spoke to police at Kevin's behest and that Eric sought assistance with robbery charges in exchange for his cooperation on the Gibson case. Gergal refused to offer a deal but noted that if Eric's information was helpful, the prosecutor could write to the sentencing judge. Gibson says that this report could have been used to impeach Kevin (Eric did not testify) because the fact that Kevin sent Eric to seek a deal suggests that Kevin had one, too.

The District Court rejected the claim, finding no evidence that Eric reached any deal and thus that the information would not have been useful in cross-examining Kevin. We agree. The report is not relevant to whether Kevin got a deal; if anything, it suggests that the prosecution was hesitant to strike deals in exchange for information. Gibson's

9

speculation about the implications of the document does not make this otherwise irrelevant document "favorable" under Brady. See Ramos, 27 F.3d at 71.

3.

Gilbert testified that on the day of the murder, he saw Gibson with a substantial amount of money and that Gibson explained that "he had to make a move, he needed money." App. 681. A few days later, Gibson told him that he had robbed "an old white guy" in Bristol Borough, killed him after the man saw his face, and had used the money to buy a car. App. 683–84, 686. Gilbert added that Gibson gave him two guns — one of which was Gibson's, and the other was Berger's. Gibson claims that the prosecution withheld evidence that Detective R.J. Mills of the Bristol Township Police and the DEA were investigating Gilbert for drug sales and that weeks before the murder, Gilbert twice sold crack cocaine to a confidential informant. Gibson argues that this could have been used to impeach Gilbert because it showed an incentive to cooperate with the prosecutors.

Based in part on its conclusion that the Bristol Township police were part of the prosecution team because Detective Mills had brought witness Eddie Jones to the attention of the prosecutors and had personally accompanied Jones to the interview, the District Court found that police reports were suppressed and that the evidence was favorable to Gibson because he could have used it to impeach Gilbert. We disagree.

Even assuming that Detective Mills' assistance in securing Eddie Jones' testimony renders the Bristol Township Police part of the Gibson prosecution team for all other witnesses, these documents do not constitute Brady material because they could not have been used to impeach Gilbert. For Gibson's theory to succeed, Gilbert would have had to

10

know that he was under investigation or that he had been caught selling drugs; otherwise, he would have had no incentive to cooperate to avoid punishment on a crime he thought he had perpetrated without detection. But nothing in the record indicates that Gilbert had such knowledge. It is thus implausible that Gilbert was cooperating with the prosecution to avoid criminal charges that he did not know he was facing, and he could not be impeached on that basis. Gibson cites various cases that he says establish that failure to disclose information about a pending investigation would violate <u>Brady</u>. However, none of those cases involved a situation where the witness was unaware of the investigation.

B.

Gibson was not prejudiced by the suppressed evidence. To begin with, none of the five impacted witnesses were particularly central to the prosecution's case. For instance, Eddie Jones, Moore, and Hess testified that Gibson told them that he planned to commit a robbery, but so did untainted witness Kevin Jones. Similarly, Eddie Jones, Pollard, Hess, and Carrol testified that Gibson admitted to them that he had committed the murder, but so did untainted witnesses Kevin Jones, Gilbert, Bernard McLean, and Kenneth Johnson.

Moreover, although the Court does not minimize the gravity of suppressing evidence — especially evidence of a highly probative nature such as that concerning Moore's mental health and Pollard's status as a serial informant who had reached a deal to testify — both Moore and Pollard's testimonies were already so thoroughly impeached that the jury was in any event unlikely to have credited them. Pollard's testimony was that he overheard Gibson confessing to the murder to David Margerum and that he "wanted to help [himself] out" by reporting it to authorities. App. 793. However,

11

Margerum — who had no apparent bias — testified that this conversation never took place. Moore's testimony revealed a history of unremitting drug and alcohol abuse, that she had given police inconsistent statements about her conversation with Gibson, and that she had an incentive to testify in order "to get out of jail" after she was arrested on a robbery charge. App. 653–55. It is simply not conceivable that whatever modicum of credibility they retained was what the jury relied upon in finding Gibson guilty. See, e.g., Landano v. Rafferty, 856 F.2d 569, 574 (3d Cir. 1988) (considering impeachment evidence immaterial under Brady where the "marginal effect in diminishing [the witness's] perceived credibility would have been negligible").

The suppressed evidence relating to Herman Carrol, concerning the possibility that he had arranged a deal in exchange for his testimony, was not so different in kind than the testimony actually elicited at trial which raised a serious implication that such a deal had been arranged. Cf. Dennis, 834 F.3d at 300 ("[W]e have granted habeas relief on the basis of a 'significant difference' between the suppressed impeachment and other types of impeachment evidence used at trial." (quoting Slutzker, 393 F.3d at 387)). The final pieces of evidence — that Eddie Jones was a paid police informant and that police forcibly kicked in Hess's mother's door when they arrested Hess — suggest that Jones and Hess had reason to testify in favor of the prosecution. But the Hess evidence was not particularly powerful, in that it required a number of inferential leaps to get from the

12

manner in which the police entered his mother's house to the conclusion that Hess only testified because of police coercion.[4]

Finally, aside from the limited impact that the suppressed impeachment evidence would have had on the relevant witness's credibility, the Commonwealth adduced substantial independent evidence establishing Gibson's guilt. Pamela Harrison — Gibson's cousin — testified that Gibson arrived at her house just after the murder occurred wearing a hooded sweatshirt and sweating heavily. Harrison said that Gibson asked to use her bathroom to wash up, took off his sweatshirt to wash it, and was carrying a gun. She added that he left the sweatshirt with her and returned later that night to pick it up.[5] Added to this, Gibson lied to police about being in Bristol Borough on that day, and two untainted witnesses placed Gibson on Ascher Health's block at the time of the murder. Lastly, Segal testified that he saw Berger struggling with an assailant in a dark hooded sweatshirt who matched Gibson's size, build, and complexion, and Colon testified that after he heard the gunshots, he saw Gibson leave the murder scene.

In light of the weight of the testimony showing that Gibson was at the scene of the crime; had a motive; had said he planned to commit a robbery; had lied to police about

---

[4] As to Jones, the Commonwealth asserts that they had disclosed prior to trial that Jones was an informant, but not that he was a paid informant. Gibson counters that the Commonwealth fails to cite to record evidence supporting this disclosure, but does not expressly deny that such information was provided.

[5] Gibson attempted to undercut Harrison's testimony by implying that the police coerced her by threatening to investigate her brother's involvement in the murder or by prosecuting her and her mother for accepting proceeds from the robbery. However, no evidence supports these allegations aside from Gibson's own testimony and Harrison denies them.

his whereabouts; was seen just after the murder carrying a gun, sweating, and trying to get rid of the clothing that the suspect was wearing; had admitted to numerous individuals that he committed the murder; and was identified in possession of a gun matching the murder weapon as well as Berger's weapon, there is no reasonable probability that the jury would have come to a different verdict based on the further impeachment of two already incredible witnesses and the minor impeachment of three others, whose testimony was amply corroborated by other untainted accounts. Because the evidence does not "put the whole case in such a different light as to undermine confidence in the verdict," we agree that there was no Brady violation.[6]  Kyles, 514 U.S. at 435

### III.

Gibson next argues that counsel's assistance was ineffective because he failed to cross-examine Segal on his inability to identify Gibson in a pre-trial lineup. We disagree.

We review ineffective assistance of counsel claims based on the test set forth in Strickland v. Washington, 466 U.S. 668 (1984), which has two requirements:  that "counsel's representation fell below an objective standard of reasonableness," id. at 688, and that but for the deficient representation, it was reasonably probable that "the result of

---

[6] Although we find that in this case the multiple items of suppressed evidence were not cumulatively material, we emphasize that "[t]he prudent prosecutor will resolve doubtful questions in favor of disclosure," Kyles, 514 U.S. at 439 (quoting Agurs, 427 U.S. at 108), and "[s]uch disclosure will serve to justify trust in the prosecutor as 'the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done,'" id. (quoting Berger v. United States, 295 U.S. 78, 88 (1935)).

14

the proceeding would have been different," id. at 694. We may decide a Strickland claim based on either prong of the analysis. See id. at 697.

Segal never claimed to have been able to identify the assailant positively; on direct examination, he forthrightly said that he could not make a facial identification. Indeed, when delivering his jury instructions, the judge reiterated that:

> Now, with respect to Mr. Segal, of course, he didn't really make an identification. As you will recall, here in court he was unable to identify the defendant as the person he says he saw engaged in the robbery in the store, and the person he saw leaving. . . . All he did was give a description, the police a description, and maybe he gave a couple different descriptions.

App. 1008–09. The jury was thus well aware that Segal could not identify Gibson and that his descriptions of the assailant had shifted. Gibson bears the burden of establishing prejudice, Strickland, 466 U.S. at 696, and, having failed to do so, his claim fails.

IV.

Gibson finally argues that all of these alleged errors cumulatively prejudiced him. "The cumulative error doctrine allows a petitioner to present a standalone claim asserting the cumulative effect of errors at trial that so undermined the verdict as to constitute a denial of his constitutional right to due process." Collins v. Sec'y of Pa. Dep't of Corr., 742 F.3d 528, 542 (3d Cir. 2014). Neither Gibson's Brady nor Strickland claims resulted in any prejudice, and they no more do so when considered together. Each witness who was impacted by a Brady violation was either already incredible or else unnecessary to the jury's determination. The addition of counsel's failure to cross-examine Segal does not move the needle because it did not plausibly have any effect on the jury's decision, let alone a significant one. There is no likelihood that the cumulative impact of the errors

15

"had a substantial and injurious effect or influence" on the jury's verdict, id., and so Gibson's claim fails.

V.

For the foregoing reasons, we will affirm the District Court's order.

16