**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-3833
_____

LAWRENCE FISHER

v.

WARDEN SOMERSET SCI,
Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. Civ. Action No. 3-06-cv-00220)
District Judge:  Honorable Kim R. Gibson
_____

Argued:  September 10, 2014
_____

Before:  SMITH, SHWARTZ, and ROTH, <u>Circuit Judges</u>

(Filed: November 5, 2014)
_____

OPINION[*]
_____

Lisa B. Freeland [ARGUED]
Office of the Federal Public Defender
1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA 15222

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

Counsel for the Appellee

Ronald M. Wabby, Jr. [ARGUED]
Allegheny County Office of District Attorney
436 Grant Street
303 Courthouse
Pittsburgh, PA 15219

Counsel for the Appellant


SHWARTZ, Circuit Judge.

The Commonwealth of Pennsylvania appeals from the District Court's order granting Lawrence Fisher's petition for a writ of habeas corpus and requiring the Commonwealth to retry Fisher for the murder of Dwayne Hudgins within 180 days or release him. The District Court concluded that the Commonwealth committed a Brady[†] violation by suppressing information about an agreement between prosecutors and a witness who testified against Fisher. Because the District Court did not consider the nature and timing of any such agreement, we will vacate the order and remand for further proceedings.

I

Hudgins was shot in Homestead Borough, Pennsylvania on January 29, 1995, while driving a car in which Richard Epps and Epps's cousins, Raheem and Artice Anderson, were riding. On the day of the shooting, police interviewed Epps. Epps told police that a passenger in a car driven by James Dorsey shot at Hudgins's car. Epps told police he knew Dorsey and had seen the passenger before but he did not know his name.

---

[†] Brady v. Maryland, 373 U.S. 83 (1963).

2

Fisher v. Rozum, No. 3:06-cv-220 (W.D. Pa. ) ("Fisher") ECF No. 2 at 23 (Epps stating that the shooter was a black male who he had seen before but that he did not know his name). The next day, Epps picked Fisher out of a photo array. Two months later, police arrested Fisher, who told police that while he did not shoot Hudgins, he knew who did. He then invoked his right to remain silent.

On April 13, 1995, Epps testified at a coroner's inquest. He explained that, before the shooting, Artice Anderson had threatened Fisher with a gun. According to Epps, about fifteen minutes later, Hudgins, Epps, and the Andersons were seated in Hudgins's car when they saw Dorsey's car approach with an individual in the passenger seat pointing a gun at Hudgins's car. Fisher, ECF No. 29-9 at 8-14. Hudgins attempted to get away from Dorsey's car, but a bullet entered through the back windshield of Hudgins's car, striking Hudgins in the back of the head and killing him, after which the car crashed. Epps said that he jumped from the car, exclaimed that a man was shot, and called for help. He also testified that police showed him photographs, he identified the photograph of Fisher as depicting the shooter, and he had "[n]o doubt" Fisher fired the shots at Hudgins's car. Id. at 19.[‡]

Approximately two weeks before Fisher's trial for Hudgins's murder, Epps, without a plea agreement, entered a guilty plea to drug charges that were filed against him in November 1994. Fisher, ECF No. 29-1. While the information concerning Epps's

---

[‡]On the same day, police interviewed Artice Anderson, who told them that Fisher had brandished a gun in a threatening way, that he saw Fisher sitting on the passenger side of Dorsey's car, but that he could not see who was shooting at them.

criminal history was disclosed to Fisher's counsel before trial, the guilty plea apparently was not.§

At Fisher's trial, Epps again testified about the shooting, including that he remained at the scene, called for help, told police he recognized the shooter but did not then know his name, and identified a photograph of Fisher as depicting the shooter. On cross-examination, Fisher attempted to impeach Epps by pointing to several purported inconsistencies between Epps's statements to police, at the coroner's inquest, and at trial. For instance, Fisher asked Epps whether he told police that he did not know who the shooter was, but Epps responded that he could identify the shooter yet did not know him by name. Fisher also highlighted that Epps initially failed to disclose to police that Artice Anderson was carrying a gun on the day of the shooting. There were also some inconsistencies between Epps's inquest and trial testimony. For instance, Epps testified at the inquest that he did not recall what Fisher was wearing besides a hat, Fisher, ECF No. 29-9 at 28, 29, 35. At trial, in contrast, he stated that Fisher was wearing a hooded sweatshirt without the hood up and that he could not recall whether Fisher was wearing a hat. Fisher attempted to impeach Epps with his prior criminal history, to which Epps acknowledged he "had a lot of cases," including a conviction for receiving stolen property. App. 106.

Raheem Anderson also testified at Fisher's trial. His testimony was generally

---

§ Although Fisher argues that the failure to disclose the fact Epps entered a plea to the drug charges before trial violated Brady, the core of his argument, and the concern of the Fisher I panel, has been that there may have been some sort of promise of leniency in exchange for Epps's testimony at Fisher's trial. The record, however, shows that Epps entered the plea to all pending charges with no plea agreement and the fact alone that he pleaded guilty would not show that an agreement of the sort about which the Fisher I panel was concerned existed. For the reasons set forth herein, the absence of information on this subject further supports our decision to remand.

4

consistent with Epps's testimony concerning the incident: he stated that he saw Fisher in Dorsey's car and that Fisher shot at Hudgins's car. Raheem Anderson also testified that Fisher had threatened to kill Artice Anderson[**] three days before Hudgins was killed. Raheem Anderson was unclear on Fisher's name and nickname, however, and admitted on cross-examination that he did not actually see Dorsey driving the car during the shooting. He further indicated that he had been more certain in his statements to police than he really felt because the interviewing officers were "[p]utting wood to the fire." App. 162-63.

Carl Sullivan, who had been housed with Dorsey at the Allegheny County Prison in February 1995, also testified. He said Dorsey told him that Dorsey admitted chasing Hudgins's car and that he wanted to kill Epps before he could testify. Sullivan did not testify about Fisher.

Fisher offered an alibi defense. His mother and brother both testified that he had been home at the time of the shooting.

The jury returned a guilty verdict after brief deliberation and Fisher was sentenced to a mandatory term of life imprisonment. He appealed his conviction to the Pennsylvania Superior Court, which affirmed, and filed a petition for allowance of appeal in the Pennsylvania Supreme Court, which was denied. On August 2, 1999, he filed a petition under the Pennsylvania Post Conviction Relief Act ("PCRA"). The state trial

---

[**]Artice Anderson invoked his Fifth Amendment privilege, did not testify at trial, and recanted his prior statements.

court denied relief, the Superior Court affirmed, and the Pennsylvania Supreme Court denied allowance of appeal.

On October 11, 2006, Fisher filed a pro se petition pursuant to 28 U.S.C. § 2254. The District Court appointed the Federal Public Defender to represent him, and on May 24, 2007, he filed an amended petition. Fisher's amended petition alleged for the first time that the Commonwealth suppressed impeachment evidence by failing to disclose that it had reached an agreement with Epps and thereby violated its Brady obligations. The District Court concluded that Fisher's Brady claim was procedurally defaulted because Fisher had failed to first raise the claim in state court. Fisher, ECF Nos. 36 & 41.

On appeal, this Court vacated the District Court's order "insofar as it dismissed Fisher's Brady claim on the ground that he failed to establish cause excusing his procedural default." Fisher v. Rozum, 441 F. App'x 115, 120 (3d Cir. 2011) ("Fisher I"). The Fisher I Court held that Fisher had shown cause because he did not know, nor could he have known, facts concerning any alleged understanding between the Commonwealth and Epps until May 2007, which was after he could have presented the claim to the state court. Id. at 119-20. The Court determined that a second PCRA proceeding would have been futile because, under Pennsylvania law, Fisher was deemed to know all facts available in the public record concerning Epps's February 1996 guilty plea and his July 1996 below-guidelines sentence, and a petition at that time based upon such facts would have been barred. Id. at 119. For these reasons, the Fisher I Court concluded that Fisher had shown "cause" for his procedural default and remanded the case with instructions

6

that the District Court examine the "prejudice" prong of the "cause and prejudice" test to determine whether to excuse his procedural default. Id. at 120.

On remand, the District Court referred the case to the Magistrate Judge. The Magistrate Judge concluded that this Court found that Epps had an agreement with the Commonwealth that was suppressed, and that Fisher therefore suffered prejudice. Specifically, the Magistrate Judge found that had Fisher known of an agreement he could have impeached Epps based on Epps's interest in benefiting from a deal with the Commonwealth and that a reasonable juror could have rejected Epps's testimony and found Fisher not guilty. For these reasons, the Magistrate Judge recommended that the District Court grant the writ and order Fisher released absent a retrial.

The Commonwealth objected, contending that no agreement had been reached and offering affidavits from two prosecutors so stating. Fisher, ECF No. 69-1, 69-2. The District Court stated that "[t]he Commonwealth's argument that there was no plea agreement [with Epps] may be one that the Court of Appeals can consider, but it is not open to this Court on remand to ignore or defy the findings made by the Court of Appeals." App. 4. The District Court then adopted the Magistrate Judge's recommendation and conditionally granted the writ, ordering that Fisher be released unless the Commonwealth retried him within 180 days. The Commonwealth appeals.[††]

---

[††] The District Court had jurisdiction over the case pursuant to 28 U.S.C. § 2254, and this Court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a). Our review of the District Court's legal conclusions is plenary and, because the District Court did not conduct an evidentiary hearing, our review of the District Court's factual determinations is also plenary. Slutzker v. Johnson, 393 F.3d 373, 378 (3d Cir. 2004).

7

III

The Commonwealth persists in its position that no agreement existed between it and Epps. The <u>Fisher I</u> Court, while not making any factual findings that an agreement indeed existed at the time of trial,[‡‡] did express a view that one may have existed. These sentiments were based in part on the prosecutor's statement at Epps's sentencing more than four months after Fisher's trial that the Commonwealth and Epps's counsel had "come to an accord" concerning Epps' sentence on the November 1994 drug charges. <u>Fisher I</u>, 441 F. App'x at 119; App. 71, 202. Because the panel in <u>Fisher I</u> had evidence that suggested some impeachment information may have existed about which Fisher was unaware, it held that there was cause to excuse Fisher's failure to raise this <u>Brady</u> claim as part of his PCRA proceedings. What both the prior panel and this panel lack are any details about the nature of any such information and the timing of when it may have come into existence.

The nature and timing of the information are relevant to both the prejudice prong for excusing procedural default and the success of a <u>Brady</u> claim. <u>Johnson v. Folino</u>, 705 F.3d 117, 128 (3d Cir. 2013) (stating that the materiality element of a <u>Brady</u> claim "mirror[s]" the prejudice showing that a petitioner must make to excuse a procedural default). To constitute a <u>Brady</u> violation, the suppressed evidence must be material, meaning that the evidence "could reasonably be taken to put the whole case in such a

---

[‡‡] <u>Fisher I</u>'s language reflects that it made no findings of fact concerning whether an agreement existed. Indeed, it referred to an "alleged deal" and described the record before it as providing "what appear to be" a "highly coincidental sequence of events" that indicate that some sort of understanding of leniency existed, including the timing of Epps's guilty plea two weeks before Fisher's trial and the Commonwealth's comments at Epps's sentencing four months later that it and Epps had come to an "accord." <u>Fisher I</u>, 441 F. App'x at 119. The timing and comment, however, were found sufficient to satisfy the "cause" prong.

8

different light as to undermine confidence in the verdict." Strickler v. Greene, 527 U.S. 263, 290 (1999) (quotation marks omitted). As the Supreme Court has explained, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995). To meet his burden, Fisher "must convince [the court] that 'there is a reasonable probability' that the result of the trial would have been different if the suppressed [information] had been disclosed to the defense." Strickler, 527 U.S. at 289. "Evidence that tends to impeach prosecution witnesses may be material under this standard." Slutzker, 393 F.3d at 387. The proper prejudice inquiry in this case, therefore, requires consideration of the nature of the impeachment information, when it came into existence, and the strength of the other evidence. See, e.g., Strickler, 527 U.S. at 292-96 (noting that even if the prosecution witness had been "severely impeached," there was "strong support" for the verdict); Johnson, 705 F.3d at 129-30 (observing that the district court failed to evaluate "the tendency and force of the undisclosed evidence" (quoting Kyles, 514 U.S. at 436 n.10)).

Here, the District Court did not have before it facts concerning the nature or timing of the alleged agreement, and thus, the District Court could not properly examine its impeachment value. The District Court simply concluded, without conducting a hearing, "that the [plea] agreement that the Commonwealth allegedly suppressed was reached in the weeks between Epps's guilty plea and Epps's testimony against Fisher."

9

App. 25. The record, however, is silent as to whether such an agreement was reached and existed at the time of Fisher's trial or occurred later.

Moreover, the District Court ignored the fact that Epps identified Fisher as the shooter long before any agreement is alleged to have existed. On the day of the murder, Epps told police he recognized the shooter but did not know his name. The very next day, Epps identified Fisher as the shooter from a photo array. Furthermore, Epps testified at the coroner's inquest on April 13, 1995— almost a year before he pled guilty to the drug charges—about Fisher's role in the shooting, and his testimony was materially consistent with his trial testimony. Even assuming an agreement was reached before trial, Epps could have been rehabilitated by these prior consistent statements. As a result, the timing of the alleged agreement is central to evaluating its impeachment value. By failing to examine this issue, the District Court did not thoroughly consider whether the non-disclosure of the alleged agreement could have had any impact on the verdict and hence prematurely, and perhaps inappropriately, concluded that there was in fact prejudice.

## IV

For these reasons, we will vacate the judgment and remand for, in connection with the prejudice prong, an inquiry into the nature and timing of any agreement between Epps and the Commonwealth, the value of such information in light of Epps's prior consistent statements and other impeachment pursued, and whether there is a reasonable probability that the result of Fisher's trial would have been different if the alleged agreement had been disclosed.

_____

ROTH, <u>Circuit Judge</u>, dissenting:

I believe that the law of the case here dictates that an understanding was in place between Epps and the Commonwealth; thus, any remand should consider only prejudice – not whether or when there was any understanding. But even if there were no understanding, I believe that there was a Brady violation. For both these reasons, I respectfully dissent.

In considering whether Fisher should have been told of the status of the charges pending against Epps, we all realize that an offender, who is experienced in the criminal justice system like Epps, knows full well the benefits that can be cultivated from the prosecutors when he cooperates, with or without an agreement, in the resolution of another crime – when he tells the prosecutors what they want to hear, whether or not it is true. When Epps first spoke to police officers at the time of the Hudgins shooting, he was well aware of the charges he was facing for drug delivery and theft offenses. When Epps was shown the photo array in the Fisher case, the police were already aware both of Epps's criminal history of 14 arrests and 4 convictions and of the charges pending against him. Both the police and Epps understood at this point how to play the game – whether or not there was an explicit understanding. For that reason, the failure of the prosecution to inform Fisher of the status of the charges against Epps constituted a *Brady* violation even absent an explicit deal.

As we noted in *Fisher v. Rozum,* 441 F. App'x 115, 119 (3d Cir. 2011) (*Fisher I),* Epps pled guilty to a number of charges just before Fisher's trial, with sentencing to occur after Epps testified at trial. After Epps testified, facing a maximum of forty-two years imprisonment, the Commonwealth agreed to a below-guideline sentence, stating that Epps was a "key witness in a homicide trial," – *i.e.*, the Fisher trial. Epps's defense counsel also represented to the court that the prosecutor in the Fisher case had told him that, without Epps's testimony, they would not have achieved a conviction in the Fisher case.

Without the testimony of this key witness, there probably would not have been a conviction. If the jury had known about Epps's guilty plea and the charges he was facing, the jury would have considered these facts in making its credibility determination about Epps. Indeed, the jury could reasonably have concluded that Epps was expecting leniency if he testified against Fisher and thus was not credible. "The materiality standard for *Brady* claims is met when 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Banks v. Dretke*, 540 U.S. 668, 698 (2004) (quoting *Kyles v. Whitley*, 514 U.S. 419 (1995)). Because there was no physical evidence that Fisher was the shooter, and as the District Court found, Epps was "was the only effective witness the Commonwealth had to offer," the defense suffered materially for being unable to impeach Epps in this way.

As we observed in *United States v. Risha*, 445 F.3d 298, 303 n.5 (3d Cir. 2006):

> There can be no dispute that the information in question is favorable to the defense because [the witness's] expectation of leniency in the state proceedings could have been used to impeach him. We also believe that

2

> there can be no serious dispute regarding materiality . . .. The question is not whether disclosure would have resulted in a different verdict, but whether suppression of the evidence "undermine[d] confidence in the outcome of the trial."

*Id.* (quoting *Kyles*, 514 U.S. at 434-35). Even with no acknowledged deal in place, the failure to disclose the guilty plea was prejudicial under *Brady*. Moreover, once we have determined that there was enough of an "understanding" to establish cause, no other information about the nature and timing of the deal is necessary for our prejudice inquiry. The inability of the defense to impeach Epps with this testimony undermines my confidence in the verdict. *See Kyles v. Whitley*, 514 U.S. at 435.

The majority, however, focuses on the "nature and timing" of a deal between Epps and the Commonwealth, stating that the *Fisher I* court did not make any factual findings as to whether a deal existed at the time of Epps's testimony. But then the majority contradicts itself by noting that the *Fisher I* panel found that "some sort of understanding of leniency" did in fact exist (citing *Fisher I*, 441 F. App'x at 119). The *Fisher I* panel remanded the case to the District Court with instructions to consider only prejudice because it had resolved the cause prong. Therefore, whether the *Fisher I* panel called it a finding of fact or not, and whether the understanding with Epps was formal or not, the panel concluded that an understanding existed between Epps and the Commonwealth. This is now law of the case.

I don't know what the majority hopes to gain on remand. The majority reasons that the "accord" that the Commonwealth and Epps had come to before Epps's sentencing hearing could have occurred in the four months after Fisher's trial, rather than

3

before it. The only reason those four months could be relevant is if the majority is suggesting that there was no deal, or in fact, no understanding, at the time of Epps's testimony. But this is precisely the conclusion that is foreclosed by law of the case. The "timing" of the deal that the majority seeks is not relevant to this case. The potential prejudice existed from the time that the police met with Epps with knowledge of Epps's past record and pending charges. There is no need to remand to consider it.

Furthermore, eventually acknowledging that some kind of understanding did exist, the majority goes on to suggest that there may be no prejudice because Epps could have been rehabilitated on the stand by his prior consistent statements. Perhaps he could have, but giving weight to such a claim puts the cart before the horse. If it matters that Epps *could* have been rehabilitated, then he must have been in need of rehabilitation. In other words, by conceding the need for rehabilitation, the majority implicitly finds that the Commonwealth's omission was prejudicial and, in fact, violated *Brady*.

In sum, Fisher was deprived of a powerful opportunity to impeach Epps's testimony. For this reason, I would affirm the District Court.